Mildred BEVIS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 78A01–9209–CR–322.

Court of Appeals of Indiana,
First District.

May 26, 1993.

Anthony J. Castor, Madison, for appellant-defendant.

Pamela Carter, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

NAJAM, Judge.

### STATEMENT OF THE CASE

Three prisoners escaped from the Switzerland County jail, and Appellant, Mildred Bevis ("Mildred"), was charged for her part

in that event. After a jury trial, Mildred was convicted of Aiding, Inducing or Causing Escape,[1] a Class C felony. As her grounds for appeal, Mildred alleges error at trial in the admission of testimony, exclusion of testimony, violation of her constitutional rights during cross-examination and prosecutorial misconduct. We reverse and remand.

### ISSUE

Mildred presents four issues on appeal. Because we conclude that one issue warrants reversal, we address only the following question: Whether the State's cross-examination of Mildred concerning her post-arrest silence violated her right to fundamental fairness guaranteed by the Due Process Clause of the Fourteenth Amendment.

### FACTS

The facts disclose that sometime between 12:30 and 1:00 a.m. on May 28, 1990, Mildred's husband, Troy Bevis ("Troy"), and two other prisoners escaped from the Switzerland County jail. They escaped through a window in their cell by using hacksaw blades, tin snips and a pocket knife in Troy's possession. Outside the jail the escapees were met by a station wagon driven by Troy's mother, Wanda Bevis ("Wanda").

Troy drove Wanda and the other escapees to Troy's mobile home where Mildred was waiting. During the ride, Troy told Wanda that he had expected Mildred to meet him. ·Wanda told Troy that she had come instead of Mildred because she did not want to involve Mildred, who had young children.

At Troy and Mildred's mobile home, Troy, Mildred and another escapee, Mark Leach ("Leach"), allegedly had a conversation in which Troy told Leach that Mildred had supplied Troy with the hacksaw blades used in the escape. When Leach asked how Troy had obtained the tools while in jail, Mildred purportedly replied that she

---

**1.** IND. CODE § 35–41–2–4 and IND. CODE  § 35–44–3–5.

had given Troy the tools during a contact visit.

Wanda subsequently drove Leach and the third escapee, Phillip Tracy III ("Tracy"), to her residence in her pickup truck where Leach and Tracy attempted to repair Troy's disabled truck. Troy and Mildred arrived at Wanda's residence shortly thereafter, and Troy helped Leach and Tracy repair the truck.

In the meantime, Indiana State Police Trooper Stan Tressler, responding to a call regarding the escape, arrived at Troy and Mildred's trailer at 2:15 a.m. Trooper Tressler knocked on the door and walked around the trailer for about ten minutes, but received no response. A light was on in the living room and there were no vehicles in front of the trailer.

At 2:52 a.m., Trooper Tressler arrived at Wanda's residence. As Trooper Tressler's vehicle crested the hill leading to Wanda's home, he was blinded momentarily by the high beam headlights of Wanda's approaching truck. Trooper Tressler noticed two people running from the scene. When Trooper Tressler asked Wanda and Mildred if the escapees were there, Wanda responded that she had not seen Troy since a visit earlier that day, and Mildred replied "I'm not saying nothing." Record at 212. The police later captured all three escapees.

Mildred and Wanda were charged by information for their part in the escape. At Mildred's and Wanda's joint trial, Leach recounted the alleged conversation between him, Troy and Mildred in which Troy and Mildred had discussed Mildred's role in the escape.

Wanda did not testify at trial, but Mildred took the stand and denied helping Troy and the others escape from jail. Mildred testified that on the night of the escape, she and Wanda were asleep at Mildred's mobile home when they received a telephone call from Troy at approximately 1:00 a.m., in which Troy informed Mildred that he had escaped and requested that she come to Wanda's home. Mildred testified that she thought Troy was joking but that she and Wanda then drove in separate vehicles to Wanda's home where they found Troy and the other men. Mildred explained that she argued with Troy regarding his escape and refused to transport him elsewhere. Mildred admitted visiting Troy the day before the escape, but she denied having given Troy the hacksaw blades during that visit.

Mildred and Wanda were both convicted of Aiding, Inducing or Causing Escape, and Mildred appeals. We will state additional facts in our discussion as needed.

## DISCUSSION AND DECISION

Mildred asserts that the prosecutor made improper references to her post-arrest silence which placed her in grave peril and violated her Fifth Amendment right against self-incrimination. Twice during its cross-examination, the State questioned Mildred about her post-arrest silence. On the first occasion, the prosecutor asked:

"Q. Let me see, you have never talked to me before have you?

A. No I have not.

Q. So I'm hearing this for the first time, right?

A. Right.

Q. So bear with me if I have to ask you to repeat a few things. Now it is a fact, isn't it, that you've never given a statement to the authorities, isn't it?"

Record at 447–48. Before Mildred could answer the last question, her counsel objected on the grounds that the prosecutor's question violated Mildred's presumption of innocence and her Fifth Amendment right to remain silent. Record at 448. The court sustained the objection. Record at 448. However, later in cross-examination, the prosecutor returned to the same inquiry:

"Q. Did you tell anybody what you told me?

A. No.

Q. Why didn't you do that?"

Record at 469. Mildred's counsel again objected on the grounds that these questions violated Mildred's Fifth Amendment rights. Record at 469. The court again sustained the objection.

■ Mildred asserts a *Doyle* violation. *See Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. In *Doyle,* the Supreme Court held that using a defendant's post-arrest, post-*Miranda* silence for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment. *Id.* at 620, 96 S.Ct. at 2245, 49 L.Ed.2d at 98. Rejecting the State's contention that it sought to use the defendant's silence for the limited purpose of impeachment on cross-examination, the Court noted that *Miranda* warnings give the criminal defendant implicit assurances that silence will carry no penalty. *Id.* at 618, 96 S.Ct. at 2245, 49 L.Ed.2d at 98. "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* We note that a *Doyle* violation is actually a violation of the Due Process Clause's prohibition against fundamental unfairness, not a violation of the Fifth Amendment privilege against self-incrimination. *See Wainwright v. Greenfield* (1986), 474 U.S. 284, 291, 291 n. 7, 106 S.Ct. 634, 638–39, 639 n. 7, 88 L.Ed.2d 623, 630, 630 n. 7.

■ We agree that the State's questions were impermissible under *Doyle.* The State sought to impeach Mildred's exculpatory testimony by making direct reference to her post-arrest silence, even though Mildred had been advised when charged that she had a right to remain silent. These questions violated Mildred's Due Process right to fundamental fairness.

At oral argument,[2] the State maintained that these questions were permissible because they were intended to impeach Mildred's testimony with her pre-arrest silence and were not directed to her post-arrest, post-*Miranda* silence. *See Beach v. State* (1987), Ind.App., 512 N.E.2d 440, 443, *trans. denied* (citing *Jenkins v. Anderson* (1980), 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86). The State was apparently referring to Mildred's statement, "I'm not saying nothing," made to Trooper Tressler before her arrest. Record at 212. However, the State conceded that these questions were not limited to Mildred's pre-arrest silence, and we believe it is apparent on the face of these questions that they were unlimited, general questions directed without distinction to Mildred's silence both before and after she was given *Miranda* warnings. These questions were impermissible under *Doyle.*

■ Our inquiry does not end there, however. Our supreme court has ruled that under some circumstances, a *Doyle* violation may be only harmless error. To determine whether a *Doyle* error is harmless, a reviewing court must ask if, absent the prosecutor's allusion to the defendant's post-arrest failure to deny the charged conduct, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. *Yurina v. State* (1985), Ind., 474 N.E.2d 93, 96–97. Put another way, a *Doyle* violation is harmless "only when the court, after assessing the record as a whole to determine the probable impact of the improper evidence on the jury, can conclude beyond a reasonable doubt that the error did not influence the jury's verdict." *Henson v. State* (1987), Ind., 514 N.E.2d 1064, 1067.

Our supreme court has also adopted a five-factor test to guide this harmless error analysis. These factors include:

"1. The use to which the prosecution puts the post-arrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference. [and]

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions."

*Bieghler v. State* (1985), Ind., 481 N.E.2d 78, 92, *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (quoting *Williams v. Zahradnick* (4th Cir.1980), 632 F.2d 353, 361–62) (alteration in original).

---

**2.** We heard oral argument at Saint Mary-of-the- Woods College on April 29, 1993.

After assessing the entire record and applying the above factors, we cannot conclude that the error here was harmless.

First, the prosecution used cross-examination to impeach Mildred's post-arrest silence. The only permissible inference that the jury could draw from these questions is that Mildred fabricated the entire story she told on the witness stand. This was not an inadvertent reference to the defendant's post-arrest silence made by another witness, *see McCollum v. State* (1991), Ind., 582 N.E.2d 804, 813, nor a reference to silence which does not have a sufficient connection to the charged conduct to require reversal, *see McCoy v. State* (1991), Ind.App., 574 N.E.2d 304, 307, nor a simple inquiry whether the defendant invoked his right to refuse interrogation or asked for counsel to be present. *See Henson*, 514 N.E.2d at 1066; *Cook v. State* (1989), Ind., 544 N.E.2d 1359, 1363. In those situations, any error occasioned by a *Doyle* violation has been held to be harmless error. Here, in contrast, the State not only asked Mildred whether she had previously told her exculpatory story to anyone else, but also asked her *why* she had failed to do so. The second, follow-up question indicates the purpose of these questions: to suggest that if Mildred's in-trial, exculpatory story were true, then she would have told the story before trial. The fact that the State twice elected to pursue this line of questioning demonstrates that the questions were intended to impeach Mildred's testimony with her post-arrest silence.

Second, the quantum of evidence in the record is not so overwhelming as to outweigh the harmful effect of the State's repeated inquiry into Mildred's silence. *See, e.g., Henson*, 514 N.E.2d at 1068 (overwhelming quantity of evidence supporting guilty verdict); *Bieghler*, 481 N.E.2d at 92 ("great deal of other evidence indicative of Appellant's guilt"). The only direct evidence produced by the State to demonstrate Mildred's guilt was Leach's testimony. However, Leach's credibility was disputed because of his plea bargain in which he had agreed to testify in consideration for the State not revoking his probation for prior convictions, for only charging him

with a misdemeanor for his escape, for receiving home detention for the escape, and for charging neither his wife nor his father for their parts in Leach's second, subsequent escape. Record at 334–35 and 397–98. Leach's trial testimony was also inconsistent with a statement he gave to an investigating officer approximately three months after the escape, inconsistent with his deposition taken a few months after the statement, and inconsistent within itself. Record at 344, 346–47, 349–52, 353–54 and 357–58. While Mildred's exculpatory story was contradictory in some respects, it was nonetheless plausible. *Cf. Phelps v. Duckworth* (7th Cir.1985), 772 F.2d 1410, 1414, *cert. denied*, 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (finding of harmless error not precluded by mere fact defendant offers implausible or highly contradictory alibi at trial). Here, the quantum of other evidence indicative of Mildred's guilt is insufficient in itself to overcome the prejudicial effect of these improper questions.

Furthermore, the prosecution pursued this line of questioning with considerable frequency and intensity. The record shows that the State directed four questions to Mildred's post-arrest silence. She was first asked to admit that she had never spoken previously with the prosecutor about her exculpatory story and then asked to admit that she had never given a statement to the authorities. She was next asked whether she had told anyone her exculpatory story, and finally she was asked why she had not told anyone her story. These were not inadvertent references to Mildred's post-arrest silence. These were direct questions designed to emphasize that Mildred had given her exculpatory testimony for the first time at trial.

Finally, although Mildred twice objected to the questions concerning her failure to tell anyone her exculpatory story at any time before trial, the court did not admonish the jury to disregard the questions nor explain that Mildred had a constitutional right to remain silent after her arrest. Following Mildred's timely objection, the trial court had an opportunity to take curative measures to reduce the prejudicial effect of

this error, but did not. Even where the trial court has admonished the jury after repeated *Doyle* violations, our supreme court has ruled that such curative measures were insufficient to remedy the harm. *Jones v. State* (1976), 265 Ind. 447, 451, 355 N.E.2d 402, 405. Here, we will not speculate on whether if the trial court had admonished the jury, the prejudice to Mildred would have been cured. Since the opportunity for the trial court to take curative measures is only a factor to consider in our harmless error analysis, we deem it sufficient to note that the jury was not admonished here.

We likewise reject the State's argument that Mildred's failure to request an admonishment or mistrial following her objection to those questions constitutes a waiver of any right to reversal on this ground. The State's position is inconsistent with the concept of fundamental error; fundamental error may be raised for the first time on appeal. *See Wilson v. State* (1987), Ind., 514 N.E.2d 282, 284. The State's reliance on *Carroll v. State* (1982), Ind., 438 N.E.2d 745, is misplaced because that case did not address waiver of fundamental error. *See id.* at 749. A *Doyle* violation is fundamental error and a party does not waive such error as an issue on appeal by failing to make an objection to the improper references at trial. *Heyward v. State* (1988), Ind.App., 524 N.E.2d 15, 19. Therefore, even if Mildred had failed to make any objections to the State's questions about her post-arrest silence, she would not have waived her right to appeal this issue.

The five *Bieghler* factors are not intended, however, to be an exhaustive or exclusive list of indicators which may assist in the determination whether a *Doyle* violation is harmless error. *Henson,* 514 N.E.2d at 1067 n. 2. Another important factor is to whom the prosecutor directs the question regarding a defendant's post-arrest silence, or from whom the prejudicial response is elicited. When the State asks the defendant about his silence, the probable impact upon the jury tends to be more harmful than harmless. Under those

circumstances, it is also presumed that the State intended to impeach the defendant's testimony with his silence. Our courts have compared intentionally asking such questions of the defendant to an "evidentiary harpoon." *See McCoy,* 574 N.E.2d at 307 n. 3 (finding *Doyle* error harmless nevertheless because improper questions and comments regarding silence only had tenuous connection to guilt). Here, the State directly questioned Mildred regarding both whether she had told her exculpatory story before trial and why she had failed to do so.

The evidentiary significance of these questions is apparent from the prosecutor's closing argument in which he focused on the credibility of Mildred's explanation of events. In closing argument the prosecutor did not comment directly on Mildred's post-arrest silence, but he repeatedly asserted that her testimony was not credible, referring to her exculpatory story as a "little cock and bull story" and a "joke." Record at 564 and 574. Thus, his questions during trial directing the jury's attention to her post-arrest silence buttressed his contention in closing argument that Mildred's courtroom testimony was untruthful.

"Because the nature of a *Doyle* error is so egregious and so inherently prejudicial, reversal is the norm rather than the exception." *Williams,* 632 F.2d at 363. We cannot conclude, beyond a reasonable doubt, that under these circumstances the *Doyle* errors in Mildred's trial did not influence the jury. Given the gravity and fundamental nature of the interests at stake, we find that the State's repeated cross-examination concerning Mildred's post-arrest silence constitutes reversible error.

Reversed and remanded.

ROBERTSON, J., and SHARPNACK, C.J., concur.