Debra J. **WILLSEY**, Appellant
(Defendant below),

v.

**STATE of Indiana**, Appellee
(Plaintiff below).

No. 83S00–9702–CR–113.

Supreme Court of Indiana.

Sept. 1, 1998.

Susan K. Carpenter, Public Defender, Lorraine L. Rodts, Deputy Public Defender, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Christopher L. Lafuse, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

In this direct appeal from a conviction for murder Debra J. Willsey contends that:

1) statements Willsey made to police during custodial interrogation should have been suppressed;

2) the State made impermissible use of Willsey's invocation of her Miranda rights;

3) bank records should not have been admitted into evidence;

4) her counsel rendered ineffective assistance; and

5) her sentence was manifestly unreasonable.

We affirm the trial court.

### Factual Background

On February 24, 1995 Debra Willsey contacted police to report the death of Robert E. Biddle. At the time of his death the sixty-eight year old Biddle suffered from heart and lung disease, diabetes, chronic bronchitis, and emphysema. He was living with Willsey, age forty, and April York, nineteen. He had known these two women only a short time. Authorities did not suspect foul play until months later, when they were prompted to investigate by one of Biddle's sisters who had belatedly learned of his death.

*The Investigation*

Police soon uncovered several suspicious facts. The night Biddle died, Willsey and York had taken him to the emergency room at Union Hospital in Terre Haute where he

complained of shortness of breath. Doctors had performed a variety of tests and determined that he was fit to be released. Linda Palmer, a registered nurse, told police that as she was discharging Biddle he said he did not want to go home with Willsey and York because the two forced him to live in a filthy environment and had stolen his money. When Palmer asked Biddle why he did not tell the two to leave, he said he was afraid that if he did they would harm him. Police also learned that during Biddle's short association with Willsey and York his bank account balance of over $12,000 had been depleted. According to the funeral home that handled Biddle's burial, two months before his death Biddle had gone to the funeral home with Willsey and made changes in his funeral arrangements that put Willsey in charge of his burial. An official at the funeral home told police that the day of Biddle's death Willsey called the funeral home, told them not to publish an obituary, and assured them that she would inform Biddle's family of his death. Police had been told by the family that they had never heard from Willsey and had learned of the death only months later from the published notice of Willsey's attempt to probate Biddle's will. Police also discovered that York had signed Biddle's interment papers posing as Biddle's granddaughter.[1]

Based on this and other information, police picked York up for questioning. York told police that after she, Willsey, and Biddle had returned from the hospital, she had gone to sleep and was wakened by a moaning sound. She looked into Biddle's bedroom and saw that Willsey had pinned Biddle to the bed and was suffocating him with a pillow. Police arrested Willsey that same day. Additional information was uncovered after the arrest. Based on Biddle's voiced concerns at the hospital on the night of his death, Nurse Palmer had requested that Sheriff Pete Jackson send someone from the Adult Services Department to visit Biddle at home the next day. Sheriff Jackson had responded to Palmer's call by telephoning the hospital where he spoke with Willsey and told her that someone from Adult Services would visit the next day. Police also learned that at the hospital Biddle had accused Willsey of taking $200 from his wallet.

### April York's Version

Medical experts at trial agreed that the medical evidence was consistent with both suffocation and death from natural causes. As a result, Willsey's conviction depended in large part on York's credibility. York testified at length to details of her and Willsey's relationship with Biddle, and to the murder she claimed to have witnessed. Her testimony tracked the story she gave to police at the outset of the investigation. What follows is a partial description of that account. York first met Willsey in the spring of 1994 when Willsey employed York to do roofing work. York moved in with Willsey in June to escape a painful divorce of her mother and stepfather, and for a brief period the two were lovers. Willsey was unemployed and had no income. At Willsey's direction, York borrowed small sums of money and food from her grandparents and turned the money over to Willsey. Willsey instructed York to call her "mom" in public to obscure the nature of their relationship. In early October 1994, the pair met Biddle at a local restaurant. Biddle, a veteran who had never married and had no children, was living in a housing facility for senior citizens. Willsey befriended Biddle and over the next eight days, Biddle signed four checks totaling $5125 made payable to cash and written in Willsey's hand. Soon Biddle and Willsey opened a joint checking account. On the twelfth day of their acquaintance, Biddle moved in with Willsey and York and soon signed another check for $1000, again written in Willsey's hand but this time made out to Willsey. Five days after moving in, Biddle changed his will to disinherit his older sister and make Willsey the sole beneficiary and executrix. Checks, bank records, and Biddle's will corroborated these details.

Almost immediately after Biddle moved in, Willsey and York urged him to look for a

---

1. Biddle had arranged to be buried in California. California law required that a family member sign an authorization for burial.

larger house. Sometime in December he bought a home and the three relocated to Universal in Vermillion County. At both locations, Biddle paid most of the bills and living expenses.[2] In the meantime, Biddle began to complain about their living conditions. Willsey owned seventeen dogs, two of whom were dead in the garage refrigerator and at least five of whom lived in the home. The house was littered with dog feces, which became a subject of Biddle's occasional complaints to York, who was supposed to clean it up. Biddle also started to complain about the financial arrangements. In November he took Willsey's name off the joint checking account and in December he paid off and destroyed his credit card which had been charged over its limit.

York testified that at the hospital the night of Biddle's death Willsey had taken $200 from Biddle's wallet and then reported the wallet as missing. York said that when Biddle requested to speak to the doctors alone, Willsey had become angry. As soon as the trio returned home that night, Biddle had gone to his room and closed the door. Willsey was angry and started rambling, saying that "she was tired of being accused of ... taking everything .... what am I going to do now. This isn't working out as I planned, what I am going to do now?" York then went to sleep, awoke to a moaning sound, ventured to Biddle's room, and saw Willsey forcing a pillow onto Biddle's face. York left the room at Willsey's direction. When Willsey emerged from the room she said "I can't believe I did this," and then made York touch the dead body, saying that Biddle "won't have to bitch at [Willsey] about anything, and he won't have any more breathing problems."

After the death, York said she observed Willsey forge three checks on Biddle's account, all dated the day of his death. Willsey handled the funeral arrangements and arranged to receive a refund from a "funeral trust" Biddle had established at a funeral home even though the terms of the trust called for refunds to go to Biddle's sister. When the error was discovered by the home Willsey refused to return the money. Willsey also had York call Biddle's insurance company, apparently believing Biddle had a life policy with a death benefit of $74,000. When it turned out the policy carried no death benefit, according to York, Willsey was "furious." York admitted to posing as Biddle's granddaughter on the interment papers.

*Willsey's Arrest and Statements to Police*

Willsey's arrest took place at her home seven months after the death. At the police station she received Miranda warnings, executed a waiver of rights, and was questioned for about ninety minutes in an audio taped statement. In response to police questioning she made statements inconsistent with York's account or with other evidence. Specifically, she told police that she and Biddle had planned to be married and that they never fought about money. She denied taking the $200 from his wallet at the hospital. She said that the day after she met Biddle he called her on the telephone in a very friendly way. However, Willsey had no telephone. Willsey said that Biddle loved the dogs and that she moved with Biddle to the new house in Universal only because he wanted to move. She said both she and Biddle had paid for the house. She also said that Biddle was very sick on the night of his death and said several times: "I'm going to die tonight." She reiterated that York discovered the body when she brought Biddle his breakfast, which was the same account she and York had given to the police on the day of the death.

The transcript of her statement was not offered into evidence and Willsey did not testify at trial. However, the interrogating officer, Trooper Brent Johnson, gave the foregoing account of Willsey's statement. Johnson's characterization of Willsey's statement pointed out that the statement was often internally inconsistent and also conflicted with York's statement and trial testimony. Johnson said that he "seriously questioned [Willsey's] truthfulness." York also made inconsistent statements and admitted at trial that she had lied to police on a number of

---

**2.** In the interim York had obtained employment but was injured on the job and claimed workers' compensation benefits. She testified that she gave these to Willsey after keeping a small allowance for herself.

occasions, including at times in her initial statement. York said that on those occasions she had lied to protect Willsey. The jury convicted Willsey of murder and the trial court sentenced her to sixty years imprisonment.

## I. Admissibility of Willsey's Statement

■ Willsey contends that the trial court erred in admitting Trooper Johnson's testimony recounting Willsey's post arrest statements in response to police questioning. Specifically, she maintains that before she was questioned or read the Miranda warnings she invoked her Fifth Amendment rights by making repeated requests to speak with her attorney. She contends police failed to honor her requests and initiated the interrogation, rendering her statements inadmissible under *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[3] This issue turns on whether Willsey did in fact invoke the right to counsel.

Willsey filed a motion to suppress these statements and objected to their introduction at trial. At the hearing on her motion to suppress Willsey testified that she asserted her right to counsel on at least three occasions and that the police ignored her requests. Despite this testimony, neither Willsey nor the State framed the suppression argument in terms of *Edwards,* which requires that any statements made by a suspect in custody after a request for counsel be suppressed unless the suspect initiates a resumption of the dialog. Instead both parties at the hearing focused on whether Willsey's waiver of rights and her statement were voluntary. Willsey's failure to raise *Edwards* explicitly may explain why the State's witnesses did not directly confirm or contest Willsey's claim that she requested counsel and the trial court made no explicit findings on the point. Nevertheless, Willsey's testimony at the hearing clearly presented a claim under *Edwards. See* Ind. Evidence Rule 103(a)(1) (for error to be preserved the specific ground of objection must be stated unless it is "apparent from the context"). In ruling on the motion, the trial court registered a single comment reflecting its low appraisal of Willsey's credibility, and summarily denied the motion without any findings.

■ Where a ruling turns on disbelief of the only testimony in the record, it would be very helpful if the trial court had made an explicit finding. The Indiana Rules of Criminal Procedure do not require such a finding, however. *Cf.* FED.R.CRIM.P. 12(e) ("Where factual issues are involved in determining a [pre-trial] motion, the court shall state its essential findings on the record."). Rather, in reviewing a trial court's ruling on a motion to suppress, we review the record for substantial evidence of probative value to support the trial court's ruling. *Peterson v. State,* 674 N.E.2d 528, 536 (Ind.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998). We do not reweigh the evidence. We resolve conflicting evidence in favor of the trial court and consider any substantial uncontroverted evidence. *Haviland v. State,* 677 N.E.2d 509, 513 (Ind.1997). If the basis for the ruling on a motion to suppress is unclear, we will uphold the trial court if a reasonable view of the evidence supports the trial court's decision. *Cf. Benham v. State,* 637 N.E.2d 133, 138 (Ind.1994). *Cf. also United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir.1994) (failure of trial court to make findings pursuant to Federal Rule of Criminal Procedure 12(e) does not necessitate remand if decision is supported by any "reasonable view of the evidence"); *accord United States v. Griffin,* 7 F.3d 1512, 1516 (10th Cir.1993); *United States v. Harley,* 990 F.2d 1340, 1341 (D.C.Cir.1993); *United States v. Yeagin,* 927 F.2d 798, 800 (5th Cir.1991). The credibility of witnesses is for

---

**3.** Willsey does not discuss what effect, if any, her waiver of Miranda rights has on her argument. Willsey's alleged requests for counsel occurred prior to her waiver of rights. *Edwards, Miranda,* and numerous other decisions elaborating the Fifth Amendment right deal with the effect of a post-waiver request for counsel. We assume without deciding that the *Edwards* rationale applies to pre-waiver requests for counsel as well.

the trial court to determine.[4] *Warner v. State*, 579 N.E.2d 1307, 1310 (Ind.1991). *Cf. United States v. Stribling*, 94 F.3d 321, 323 (7th Cir.1996) ("Because the resolution of a motion to suppress is necessarily fact-specific, we give special deference to the district court that heard the testimony and observed the witnesses at the suppression hearing."). Under this standard of review, although the trial court did not specifically address whether Willsey requested counsel, there are grounds in the record to affirm the trial court.

The issue turns on whether Willsey requested counsel as she asserts. The record supports the conclusion that by denying the motion, the trial court simply disbelieved Willsey based on its perceptions of her demeanor and veracity. First, although there are no findings that explain the trial court's ruling, as discussed below it is clear from the record that the trial court did not find Willsey to be a credible witness on the question of whether she signed the rights waiver form. Further, there is substantial circumstantial evidence surrounding Willsey's interrogation that supports a finding that Willsey did not request counsel as she asserts.

At the hearing on the motion to suppress Willsey testified that after her arrest, but before being questioned or read the Miranda rights, she made three separate requests to speak with her attorney. Willsey was arrested at her home in the presence of three officers: Trooper Johnson, Deputy Larry Keller, and Sheriff Paul Curry. She testified that she made one request to Curry in the driveway of her home outside of his squad car when only she, Curry and a neighbor, Beverly Crawford, were present. Crawford testified that she overheard Willsey tell Curry two times that she wanted to talk to her lawyer and that Curry did not respond. Willsey said she again requested an attorney when she was alone with Curry in his squad car but that Curry told her she would have to wait until they got to the jail. Curry did not testify at the suppression hearing. Willsey's and Crawford's account of these requests is thus not directly contested.

Willsey also testified that she requested an attorney a third time when she and Trooper Johnson were at the jail on their way to the interrogation room, shortly before Johnson read her the Miranda warnings. She said that Johnson responded that it was too late in the day and that he wanted to question her while "everything was fresh." Johnson was called by Willsey and in response to Willsey's counsel's question whether he heard Willsey request an attorney at the residence Johnson answered that he had not. Willsey gave her testimony after Johnson had testified, and Johnson was not recalled to verify or refute whether Willsey made this request. Accordingly, it too is not directly contested.

Willsey's credibility was tangibly called into doubt during her testimony. Willsey testified that she had no recollection of (1) being read her rights, (2) being presented with a rights waiver form, (3) initialing a form, or (4) signing a form. When presented with a rights waiver form and asked to confirm that her signature and initials were on the form, she claimed that she could not read without glasses. However, as the trial court commented in denying the motion to suppress, Willsey was able to read without glasses at the same hearing from a list of technical names of prescription drugs. The record also clearly reflects challenges to the veracity of Crawford, but contains no evidence or finding by the trial court that is helpful.

▮ Aside from the issue of credibility, however, the trial court's decision was supported by conflicting evidence. Johnson testified that in the presence of two other

---

**4.** This case presents the uncommon situation where credibility turns not on a choice between two witnesses offering different versions, but instead hinges on whether to believe a single witness asserting a version of events without contradiction. Even in this unconventional situation, the trial court is in the best position to evaluate credibility and as the fact finder at the hearing is free to choose to disbelieve uncontested testimo-

ny. *Cf. Ondato v. Standard Oil Co.*, 210 F.2d 233, 236 (2d Cir.1954) (L. Hand, J.) (in passing upon a directed verdict, appellate court must assume that testimony of witnesses for the losing party "was entitled to the full measure of credibility"; only the jury as the ultimate finder of fact is "free to discard" witness testimony on the ground of disbelief).

officers he read the Miranda warnings to Willsey, and that she waived them in writing. A signed waiver was produced. Willsey's recorded conduct from the time she waived her rights to the end of the interrogation does not suggest a person who had made unequivocal, repeated requests for an attorney. Willsey claimed she did not recall being read her rights, and hinted that it may not have been she who signed the rights waiver form. However, the transcript offered at the hearing on the motion to suppress indicates that Willsey acknowledged that she had been read and had waived her rights:

> Johnson: Okay Debbie, I told you the reason we're in here. Just prior to the interview, I read you your [M]iranda rights, I explained to you what they were, I asked you to initial next to each one of the sentences correct?
>
> Willsey: Mm
>
> Johnson: And uh ... saying that you understood what they were. And I told you that the reason you're here today, is that uh ... it's ... leading into the events surrounding the death of Robert E. Biddle.
>
> Willsey: Mm.
>
> Johnson: Correct?
>
> Willsey: Right.

During the entire ninety minute recorded interview, Willsey did not request an attorney, indicate that she had ever requested one, or ever express any hint of frustration that her alleged repeated requests were not honored. We emphasize that the prophylactic nature of Miranda warnings is designed to prevent a person in custody from being coerced into waiving her rights or bullied into giving a statement. However, no such assertion is made here and the record does not support one. Rather, Willsey appears to have been willing to talk and cooperative if not always forthright. At one point, Willsey specifically mentioned her attorney, stating that she would not take a polygraph examination without her attorney present. Johnson responded asking "[a]re you telling me you want to talk to your attorney or are you just telling me you don't want to take a polygraph?" Willsey answered: "I'm not going to take no polygraph, because I don't believe in them." Thus when Willsey was explicitly asked if she was requesting counsel, she did not respond affirmatively. If Willsey had asserted her right, evidence that she failed to assert it again or waived her right at the behest of police would not vitiate the effect of the right's invocation. *See Edwards*, 451 U.S. at 487, 101 S.Ct. 1880, 68 L.Ed.2d 378. But in this case the written waiver, explicit reference to it at the outset of the recorded interview, and Willsey's conduct in the interrogation are relevant to her credibility on the question of whether she asserted the right at all. In sum, reviewing the conflicting evidence in favor of the trial court's ruling, we conclude that there was substantial evidence of probative value to support the trial court's conclusion that Willsey's Fifth Amendment right to counsel was not invoked, and therefore was not violated.[5]

## II. *Doyle* Error

Willsey contends that the State impermissibly used a request for an attorney that she made after the conclusion of her recorded statement as evidence that she was conscious of her guilt. She says her request was an invocation of the right to remain silent. The use of a defendant's assertion of the right to remain silent either to impeach or as substantive evidence violates the Due Process Clause of the Fourteenth Amendment. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). The assertion of the right to remain silent "includes the statement ... of a desire to remain silent until an attorney has been consulted." *Wainwright*, 474 U.S. at 295 n. 13, 106 S.Ct. 634. *See also*

---

5. Willsey also contends that her Sixth Amendment right to counsel was breached. The Sixth Amendment right does not attach until adversary judicial proceedings against the suspect have begun. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Formal arrest is generally not sufficient to trigger the right; rather a formal charge—the filing of an information—or an arraignment is required. *See id.; Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). No such formal proceeding had been initiated by police at the time of Willsey's interrogation. Accordingly, this provides no basis for reversal.

*Lynch v. State,* 632 N.E.2d 341 (Ind.1994) (State's use of defendant's invocation of the right to an attorney was *Doyle* error). Willsey did not object to the prosecutor's conduct on these grounds at trial. To avoid waiver she contends that a *Doyle* error is fundamental citing *Wilson v. State,* 514 N.E.2d 282, 284 (Ind.1987) (holding a *Doyle* error to be fundamental and not subject to waiver); *Bevis v. State,* 614 N.E.2d 599, 604 (Ind.Ct.App. 1993).

Even if available on appeal, however, we do not find a *Doyle* error. Willsey points to the following testimony from Trooper Johnson, describing his dealing with Willsey after he had ended the formal interview with Willsey and turned off the tape recorder:

State: Did the defendant continue to talk to you after the formal interview had been concluded?

Johnson: Yes the defendant did.

State: Okay, did the defendant make any statements regarding Mr. Biddle's death at that time?

Johnson: Yes, the defendant spoke to several of us there in the room....

. . . .

State: What statement did the defendant make regarding Mr. Biddle's death?

Johnson: Towards the end, just prior to the time that, uh, I quit talking with the defendant, she makes a comment to the effect that, "Oh my God I don't believe I'm saying this." She says, "I'll tell you if you want to know how Mr. Biddle died," she said, "If you'll call my attorney, Woody, if you want to know how Mr. Biddle died, I'll tell you then," which lead [sic] me to believe that, you know, she, uh, there was something that she was wanting to tell me she just wouldn't cross that bridge.

State: Well you ... once the defendant asked for an attorney, you can't continue taking statements if they're going to talk about a specific event, is that correct?

Johnson: Correct, ma'am, yes.

State: And her indication was that she would talk to you about Mr. Biddle's death if you would get her attorney present?

Johnson: Yes.

In *Doyle* two defendants, tried on identical evidence, refused to talk to police after their arrest but at trial offered an exculpatory version of events. To impeach the defendants' testimony, on cross-examination the prosecutor repeatedly asked the defendants why they did not offer this version to police after their arrest but instead chose to remain silent. The Supreme Court held that it was fundamentally unfair and a deprivation of due process to advise defendants of their right to remain silent and then to punish them if they chose to exercise that right. In other words, the prosecution may not use a defendant's decision to stand mute in order to create an inference of guilt—a proposition fleshed out in a number of decisions. *See United States v. Tenorio,* 69 F.3d 1103 (11th Cir.1995); *United States v. Kallin,* 50 F.3d 689 (9th Cir.1995); *Williams v. Zahradnick,* 632 F.2d 353 (4th Cir.1980); *Henson v. State,* 514 N.E.2d 1064 (Ind.1987); *White v. State,* 647 N.E.2d 684 (Ind.Ct.App.1995). The Court expanded this holding in *Wainwright* to bar use of the defendant's decision to remain silent and to request an attorney as evidence that the defendant was rational, and not insane as was claimed at trial. *See also Lynch,* 632 N.E.2d at 342; *Wilson,* 514 N.E.2d at 284. In all these cases, the prosecution used the silence or the request for counsel itself to implicate the defendant in some way.

According to Johnson, the formal interview had ended when Willsey decided to initiate further conversation. She began without reference to her Fifth Amendment rights, as if making an admission of some kind: "Oh my God, I don't believe I'm saying this.... I'll tell you if you want to know how Mr. Biddle died." Surely catching the attention of the police officers present, she followed up her offer with a condition: "If you'll call my attorney, Woody, if you want to know how Mr. Biddle died, I'll tell you then." Johnson made the natural inference that there was something Willsey knew about Biddle's death, but "she just wouldn't cross that bridge" and tell the police. The damaging inference, if any, stems from Willsey's admission that she knew something about the circumstances of Biddle's death and not from the fact that she mentioned her attorney.

By contrast, in *Doyle* and *Wainwright* the prosecution used the act of the defendant's silence or the fact of the request for counsel itself as indicative of guilt or damaging to credibility. As the Seventh Circuit noted in describing *Doyle* analysis, the central constitutional inquiry is "the particular use to which the post-arrest silence is being put.... *Doyle* does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor." *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir.1991) (no *Doyle* error where the "inadvertent mention of petitioner's request for counsel was not argued to the jury nor was it ever used to impeach petitioner"); *see also United States v. Higgins*, 75 F.3d 332, 333 (7th Cir.1996) ("A statement such as 'I told the suspect that he could remain silent, and he did' does not ask the jury to infer guilt from silence."). *Cf. Greer v. Miller*, 483 U.S. 756, 764, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (no *Doyle* error where after improper question about defendant's silence prosecutor was not permitted to make "specific inquiry or argument" respecting the silence). A suspect may not package a confession of guilt with a request for counsel—e.g., "I did it. I want to speak with an attorney"—and then seek to exclude the confession. Here, the State took advantage of Willsey's implication of sinister knowledge, not the request for counsel. Accordingly, *Doyle* error did not occur and the trial court did not err in admitting Johnson's testimony.

### III. Bank Records Evidence

 Willsey contends that the trial court erred in admitting into evidence certain checks written by her on Biddle's account and records of Biddle's credit card transactions. Specifically, the State offered into evidence five checks written on Biddle's account within the first two weeks of his meeting Willsey and York. Each check was written by Willsey but signed by Biddle. Four were written to cash and purportedly endorsed by Biddle. The fifth was written to and endorsed by Willsey. The credit card statements showed the monthly charges of the account that Biddle closed in December after he complained that Willsey was charging too much. In one month, the card was used to purchase over five hundred dollars at Walmart, despite a credit limit of five hundred dollars. Willsey objected to the evidence at trial on relevance grounds. Ind. Evidence Rule 401, 402. She now contends on appeal that it should not have been admitted under Indiana Evidence Rule 404(b). A defendant may not raise one ground for objection at trial and argue a different ground on appeal. *Marshall v. State*, 621 N.E.2d 308, 316 (Ind.1993). Accordingly, the 404(b) issue is waived. As to the objection made at trial and raised again on appeal, albeit indirectly, the standard for relevant evidence is a liberal one under Rule 401 and we review a trial court's ruling as to relevance for an abuse of discretion. *Thompson v. State*, 690 N.E.2d 224, 233 (Ind.1997).

The State's theory of the case was that Willsey took money from Biddle over a period of months, positioned herself to manage his estate, encouraged him to change his will, and murdered him after she learned that Biddle had asked authorities for help. Under this theory, Willsey's financial benefits from Biddle were in jeopardy if she waited for Biddle to die of natural causes. The State offered the bank records as evidence of Willsey's relationship with Biddle, namely that Willsey looked upon Biddle as a source of income, and that Biddle was balking at continuing this relationship. The records corroborated York's testimony that Biddle destroyed the credit card in frustration with Willsey, and York's characterization of Willsey's financial dealings with Biddle. The trial court acted within its discretion in admitting this evidence.

### IV. Ineffective Assistance of Counsel

 Willsey contends she received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution. She claims that counsel's performance was deficient for failing to object to the admission of numerous items of evidence and for failing to object to prosecutorial misconduct during closing argument. No claim is based on trial counsel's handling of the issues discussed in Part I of this opinion. Each of Willsey's claims of counsel failure

must be assessed against the two part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Willsey must demonstrate that her counsel's performance fell below an objective standard of reasonableness, and that she was prejudiced by the substandard performance. *Id.* at 687–96, 104 S.Ct. 2052; *Alvarado v. State*, 686 N.E.2d 819, 822 (Ind.1997).

Willsey contends that her counsel's performance was deficient for failing to object to the admission of evidence of other crimes, wrongs, or acts. Ind. Evidence Rule 404(b). She divides this 404(b) evidence into four categories: evidence that Willsey (1) "misappropriated" monies from Biddle before his death; (2) forged a notary's signature and stole the notary's seal; (3) stole by forgery from Biddle after his death; and (4) kept two dead dogs in her refrigerator and left dog excrement on the floor of the house.

■ When a claim of ineffective assistance of counsel is based on counsel's failure to object, the defendant must show that a proper objection would have been sustained. *Lowery v. State*, 640 N.E.2d 1031, 1042 (Ind. 1994). The evidence of misappropriation was offered not to show "propensity," but to show various facts about the crime with which Willsey was charged. Relevance was the proper issue, and for reasons already discussed the trial court's rulings on relevance were not reversible error. The bank records combined with York's testimony are probative of Willsey's attitude toward Biddle before his death and her motive for killing him. Any unfair prejudice resulting from this evidence is minimal. Accordingly, Willsey does not establish deficient performance because she does not show that an objection to this misappropriation evidence on 404(b) grounds would have been sustained. *Id.*

■ Nor does Willsey make this showing with respect to evidence that Willsey forged the signature of a notary public on a "contract" between her and Biddle and that Willsey stole the notary public's seal, which sealed the document. The contract, signed by Biddle and Willsey, witnessed by York, and bearing a notary public's signature, provided that Biddle would pay Willsey $300 dollars per week, and further provided that upon Biddle's death Willsey would have complete ownership of Biddle's estate, personal property, and a lockbox containing $6000. Willsey stipulated to the admission of the contract. The contract was dated July 1994, before York said that she and Willsey had met Biddle. York testified that Willsey told her the early date was necessary to prove that Willsey had known Biddle for a long enough time to obtain control of his estate. Evidence that the notary public's signature was forged and sealed with a stolen seal corroborated York's testimony as to the false date of the document. Accordingly, Willsey does not show that had a 404(b) objection been made, it would have been sustained. *Id.*

■ The evidence of forged checks after Biddle's death and the dog evidence is not evidence of other crimes, wrongs, or acts offered to prove Willsey's character "in order to show action in conformity therewith." Evid. R. 404(b). The evidence that Willsey forged three checks on Biddle's account after he died reinforces the circumstantial evidence that Willsey misappropriated money before he died and was additional evidence of her motive. Although this evidence speaks to Willsey's criminality, it does not suggest violence or propensity to murder. The evidence that Willsey kept two dead dogs in the refrigerator and left dog feces on the floor of the house, although of little bearing on her motive for murder, is at least marginally relevant to establish Biddle's dissatisfaction with his living arrangements and therefore the risk Willsey ran of losing his support. It speaks more to eccentricity than criminality and is not propensity evidence. The balance of potential prejudice against the relevance of these items does not require their exclusion.

■ Willsey's next contention of ineffective assistance stems from counsel's failure to object to parts of the State's closing argument. During Willsey's closing argument Willsey repeatedly attacked York's credibility, asking why York continued to lie for Willsey and to live with her for months after Biddle's death. Willsey invited the jury to disbelieve York's explanation that she was

afraid of Willsey. Willsey suggested that if York had really been through a grueling emotional experience, the State would have presented experts to testify about the impact the volatile relationship had upon her. In response, the State claimed that under the rules of evidence, they could not bring in experts to testify about the emotional impact on York. The State went on to bolster York's credibility and stated:

> I wanted to understand [York]. I wanted to ... try to understand how somebody has that kind of fear. I wanted to try and understand why she said she couldn't leave. I wanted to understand why she didn't leave and ... it was hard to understand but you know what occurred to me? I see this same behavior every single day in this job. I see behavior where people who are involved in intimate relationships stay in abusive relationships, they try to protect the abuser and they can't leave. And you know where I see it? I see it between men and women. April York has every one of the single characteristics that you find in a battered spouse. And I thought ... maybe that's how I have to look at it. Maybe it does not make any difference. If there is an intimate relationship that is abusive maybe it doesn't make any difference if it's between a man and woman or if it is between a woman and another woman.

Willsey contends that the State's reference to York as a "battered spouse" was improper because it drew a conclusion about York that was not supported by the record and was a statement of the prosecutor's personal opinion as to York's credibility. Even if we assume these contentions, counsel's failure to object may well have been grounded in a decision that an objection would call undue attention to the State's remark or would be seen by the jury as aggressive and unsympathetic. As such it does not establish ineffective assistance. *See Roche v. State,* 690 N.E.2d 1115, 1126 (Ind.1997) (a matter of trial strategy "cannot form the basis for establishing ineffective assistance of trial counsel unless there was no sound basis for not pursuing the strategy").[6]

■ Willsey also contends that counsel should have objected to the following comment in the State's closing argument:

> I do not know why this woman [Willsey] is what she is but I know what she is and you know what she is. She is a liar. She is a thief. She is a multiple forger and she is a murderer. She is a predator. She is nothing more and she is nothing less than a predator.

Willsey contends that this statement encouraged the jury to convict her on the basis of her character. We disagree. Taken in context, the statement describes the murder as one where Willsey preyed upon, stole from and killed her victim. That Willsey was a liar, a thief and a forger is supported by the admissible evidence. *Cf. Messer v. State,* 509 N.E.2d 249 (Ind.Ct.App.1987) (failing to object to State's final argument was deficient performance where State urged jury to convict based on inadmissible prior convictions and other irrelevant and prejudicial considerations).

Willsey next contends that the failure to object to State's Exhibit 8 was also ineffective assistance because she claims it was the fruit of an unconstitutional search and inadmissible. Exhibit 8 is a notarized document signed by Willsey wherein she purports to give all her personal property to a friend in return for discharge of an $8000 debt. In making her contention Willsey does not discuss the exhibit or explain how its admission into evidence affected the proceedings. Accordingly, as to Exhibit 8, Willsey presents no prejudicial effect and her ineffective assistance claim cannot succeed.

Finally, Willsey contends that it was ineffective assistance not to object to "the State's use of [Willsey's] post-arrest silence," i.e., the *Doyle* issue discussed in Part II *supra.* Be-

---

**6.** Willsey also claims ineffectiveness based on the cumulative effect of counsel's deficient performance. She maintains the panoply of character and other evidence erroneously admitted resulted in conviction on the basis of her character and irrelevant evidence. However, bizarre crimes beget bizarre facts, and, as noted above, objections to most, if not all, the contested evidence would not have been sustained. As a result the cumulative effect of counsel's asserted deficient performance is not enough to show prejudice.

cause we hold that *Doyle* error did not occur, this ineffective assistance of counsel claim also fails. *Lowery,* 640 N.E.2d at 1042.

### V. Sentencing

▮ Willsey contends that her sentence was manifestly unreasonable. At the time of the crime, the presumptive term for murder was forty years with a maximum twenty year enhancement.[7] IND.CODE § 35–50–2–3 (1993). In sentencing Willsey, the trial court found several statutory aggravating circumstances: (1) the age of the victim (over sixty-five); (2) Willsey's prior misdemeanor conviction for check deception; and (3) the nature and circumstances of the crime committed. IND.CODE § 35–38–1–7.1 (1993). The court found Willsey's health to be a mitigating circumstance. The court determined that the aggravating circumstances outweighed the mitigating circumstance and warranted a twenty year enhancement resulting in a sentence of the statutory maximum sixty years.

▮ Willsey argues that the trial court gave inordinate weight to the misdemeanor conviction and that reliance on the circumstances of the crime—that Willsey misappropriated money from Biddle—was inappropriate because, as she unsuccessfully contended in this appeal, the evidence of this activity was erroneously admitted. She submits that an enhancement of ten years is more appropriate and requests this Court to revise her sentence accordingly. It is within the discretion of the trial court to determine whether a presumptive sentence will be increased because of aggravating circumstances. *Isaacs v. State,* 673 N.E.2d 757, 765 (Ind.1996). Although the Indiana Constitution confers upon this Court the power to revise sentences, IND. CONST. art. VII, § 4, we may do so only when a sentence authorized by statute is "manifestly unreasonable in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 17(B). It is within the trial court's discretion to determine the appropriate sentence and the trial court will be reversed only upon a showing of a manifest abuse of discretion. *Ector v. State,* 639 N.E.2d 1014,

1015 (Ind.1994). The trial court's list of aggravating circumstances, including its emphasis on Willsey's manipulative and calculating behavior, does not demonstrate an abuse of discretion.

### Conclusion

We affirm the trial court.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

---

**7.** For murders committed between July 1, 1994 and May 5, 1995 there were two versions of Indiana Code § 35–50–2–3 on the books. *See* *Smith v. State,* 675 N.E.2d 693 (Ind.1996). It is clear that the trial court applied the correct version in this case.