**James A. WASHBURN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 29A02–0609–CR–805.**

Court of Appeals of Indiana.

June 26, 2007.

James D. Crum, Matthew L. Hinkle, Coots, Henke & Wheeler, P.C., Carmel, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, James A. Washburn (Washburn), appeals the trial court's denial of his Motion to Suppress evidence.

We affirm.

### ISSUE

Washburn raises one issue on appeal, which we restate as follows: Whether the trial court erred when it denied Washburn's Motion to Suppress evidence seized during the execution of a search warrant which was based on information obtained from a warrantless trash pull.

### FACTS AND PROCEDURAL HISTORY

In September of 2005, Detective Robert Locke of the City of Carmel Police Department (Detective Locke) received a telephone call from Detective Willy of the Westfield Police Department (Detective Willy). Detective Willy stated that a concerned citizen had advised him that a James Washburn residing in Carmel was involved in the use and sale of cocaine. Detective Locke learned that Detective Willy had received this information from Tyler Pryor (Pryor), a citizen Detective Willy had known for "an extended period of time." (Transcript p. 7). Calling the telephone number given to him by Detective Willy, Detective Locke spoke with Pryor who provided him with his date of birth and social security number. During the telephone conversation, Pryor agreed to come to the Carmel Police Department

to speak in person with Detective Locke. Before the meeting, Detective Locke verified Pryor's identity and discovered a lengthy criminal history which included prior arrests and convictions.

On September 6, 2005, Pryor met with Detective Locke at the Carmel police station. Pryor divulged that Washburn resided off of Royce Court near 126th street, in Carmel. He advised that his former girlfriend, Rhonda Thompson (Thompson), sometimes stayed at Washburn's residence. Pryor stated that Washburn had a cocaine problem and that he would get his cocaine from "a subject on the west side of Indianapolis." (Tr. p. 10). He specified that Washburn would subsequently distribute the cocaine to "females" and Thompson. (Tr. p. 10). Pryor further informed Detective Locke that he had visited Washburn's residence one to two months before the instant meeting and that he had seen cocaine laying around.

During the meeting that lasted thirty to forty-five minutes, Detective Locke attempted to determine Pryor's motives for coming forward with this information in an effort to rule out any improper motives of revenge or jealousy. Denying this, Pryor clarified that he was concerned about the cocaine source in Indianapolis and that, if this source was stopped, Washburn's and Thompson's cocaine addiction might end. He added that Thompson has a teenage child that was being left alone too much because of Thompson's cocaine use. After this personal meeting, Detective Locke talked to Pryor multiple times on the phone. Verifying Pryor's information, Detective Locke obtained information from dispatch confirming that Washburn lived on Royce Court and matched the general description provided by Pryor.

Based on Pryor's information, Detective Locke drove by Washburn's residence on September 6, 2005. While driving by the house, he observed a blue trash can at the end of the residence's driveway, set out to be picked up. At approximately 4:30 a.m. the following morning, Detective Locke, accompanied by two other officers, returned to Washburn's residence to seize the trash can. Attempting to be as unobtrusive as possible, the officers wore plain clothes, pulled the trash can into a pickup truck and emptied its contents into the back of the truck. Sifting through the trash, Detective Locke found plastic baggies with the ends tied off in a knot. He also discovered five smaller baggies not knotted up, containing a white rock-like powdery substance which tested positive for cocaine. Together with the baggies, he located a glass type tube with burnt residue on each end. The following day, September 7, 2005, Detective Locke obtained a search warrant for Washburn's residence based on Pryor's information and the evidence discovered in Washburn's trash. On September 8, 2005, Detective Locke executed the search warrant of Washburn's residence.

On September 21, 2005, the State filed an Information charging Washburn with Count I, possession of cocaine, a Class B felony, Ind.Code §§ 35–48–4–6(a); 35–48–4–6(b)(2); and Counts II & III, possession of a controlled substance, Class C felonies, I.C. § 35–48–4–7(a). On January 18, 2006, Washburn filed his Motion to Suppress the evidence resulting from the warrantless trash pull. On July 3, 2006, after a hearing, the trial court denied his motion. On September 22, 2006, Washburn filed his Petition for an Interlocutory Appeal with this court after the trial court granted his request for certification. On October 30, 2006, we accepted jurisdiction of his interlocutory appeal.

Additional facts will be provided as necessary.

### DISCUSSION AND DECISION [1]

■ Washburn now contends that the trial court erred in denying his Motion to Suppress evidence. Specifically, Washburn claims that pursuant to Article I, Section 11 of the Indiana Constitution, Detective Locke's search and seizure of his trash can was not supported by reasonable suspicion.

### I. *Standard of Review*

■ At the outset, we note that a review of the denial of a motion to suppress is similar to other sufficiency matters. *Bentley v. State,* 779 N.E.2d 70, 73 (Ind.Ct.App.2002); *Overstreet v. State,* 724 N.E.2d 661, 663 (Ind.Ct.App.2000), *reh'g denied, trans denied.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Overstreet,* 724 N.E.2d at 663. However, unlike a typical sufficiency of the evidence, we must also consider the uncontested evidence favorable to the defendant. *Id.*

### II. *Analysis*

■ In *Litchfield v. State,* 824 N.E.2d 356 (Ind.2005), our supreme court altered the rules of warrantless trash collection by the police. In essence, the *Litchfield* court determined that it was unreasonable for police "to search indiscriminately through people's trash." *Id.* at 363. More specifically, *Litchfield* announced a two-part test for determining whether a trash search is reasonable. First, the search must be based upon an "articulable individualized suspicion that illegal activity is or has been taking place, effectively, the same as is

required for a '*Terry* stop' of an automobile" before an officer could seize trash set our for collection. *Id.* Additionally, the trash must be retrieved in substantially the same manner as the trash collector would take it. *Id.*

■ In construing these rules, it has been determined that reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence, but it still requires at least a minimal level of objective justification and more than an inchoate and unparticularized suspicion or "hunch" of criminal activity. *Eshelman v. State,* 859 N.E.2d 744, 748 (Ind.Ct.App.2007), *trans. denied* (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). When reviewing a determination of reasonable suspicion to support a warrantless search, the court examines the totality of the circumstances of the case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *Turner v. State,* 843 N.E.2d 937, 944 (Ind.Ct.App. 2006), *reh'g denied.* The reasonable suspicion requirement is satisfied when the facts known to the officer, together with the reasonable inferences arising from such facts would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. *Id.*

In the case before us, the main question revolves around *Litchfield's* first prong: whether Officer Locke had an articulable individualized reasonable suspicion to search Washburn's trash. If the evidence

---

1. We note that in developing his analysis, Washburn relies heavily on Detective Locke's deposition statement and not on the evidence developed during trial and transcribed in the transcript. However, Detective Locke's deposition statement was not offered or admitted as an exhibit before the trial court. As we

may consider only evidence that has been introduced and properly admitted by the trial court, we will ignore all references to Detective Locke's deposition. *See Mann v. Russell's Trailer Repair, Inc.,* 787 N.E.2d 922, 930 (Ind.Ct.App.2003), *reh'g denied, trans. denied*

fails to establish this requirement, Detective Locke could not have validly found the baggies and cocaine residue in the trash and could not have relied upon that evidence to establish probable cause for the search warrant of Washburn's residence. Any reasonable suspicion that Detective Locke may have had that Washburn was involved in criminal activity would have originated with the information supplied by Pryor. In disputing the quality of Pryor's information, Washburn makes a two-fold argument: (1) because of Pryor's criminal history and motive for divulging the information, he cannot be considered a reliable source; and (2) Pryor's information was stale as it was two months old.

### A. *Reliable Source*

The United States Supreme Court has held that an anonymous tip is not enough to support the reasonable suspicion necessary for a *"Terry"* stop. *State v. Litchfield*, 849 N.E.2d 170, 174 (Ind.Ct. App.2006), *trans. denied* (quoting *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)). However, a tip from an identified or known informant can provide the basis for an investigatory stop if it contains sufficient indicia of reliability. *Kellems v. State*, 842 N.E.2d 352, 355 (Ind. 2006), *reh'g granted on other grounds*, 849 N.E.2d 1110, 1114 (Ind.2006). One of the reasons for this is that "a known or identified informant's reputation can be assessed and ... [he may] be held responsible if [his] allegations turn out to be fabricated...." *Id.* Whether a tip has sufficient indicia of reliability to establish reasonable suspicion is determined by looking at the totality of the circumstances. *Id.* at 356; *Coleman v. State*, 847 N.E.2d 259, 266 (Ind.Ct.App.2006), *reh'g denied, trans. denied.*

Our case law has established that there are two major types of informants, professional informants and cooperative [or concerned] citizens, and the test for determining the reliability of each is different. *Kellems*, 842 N.E.2d at 356. Here, the evidence establishes that Pryor contacted the police as a concerned citizen. The record is devoid of any evidence reflecting that Pryor was a professional informant. In effect, during his testimony, Detective Locke frequently referred to Pryor as a concerned citizen. With respect to cooperative and concerned citizens, we have observed and concluded that

> This group includes the victims of crime or persons who personally witness a crime. These individuals generally come forward with information out of the spirit of good citizenship and the desire to assist law enforcement officials in solving crime. They are usually one-time informants and no basis exists from prior dealings to determine their reliability. Further, information of this type usually goes to past completed crimes rather than future or continuing crimes.

*Id.* (quoting *Pawloski v. State*, 269 Ind. 350, 380 N.E.2d 1230, 1232 (1985)). While there may be greater indicia of reliability in the report of a concerned citizen, the ultimate test to establish reasonable suspicion is the "totality of the circumstances." *Id.*

In *Kellems*, McDonald, a citizen, called the Tell City police department reporting a possible intoxicated and suspended driver. *Id.* at 353. McDonald not only provided her name and date of birth but also described the vehicle, license plate number, the name of the driver and the direction in which Kellems was heading. *Id.* at 356. She related the fact that there were children in the vehicle. *Id.* The *Kellems* court found that McDonald offered the police sufficient information to allow them to corroborate her assertions independently. *Id.* Based on the totality of the circumstances, our supreme court concluded that

the information provided reasonable suspicion to support an investigatory stop. *Id.* at 357. Furthermore, the court noted that if McDonald had given a knowingly false report she could be identified so as to be held criminally liable for false reporting. *Id.* at 356.

In the case before us, Detective Locke also had ample opportunity to assess Pryor's credibility and corroborate his information. However, unlike *Kellems,* where McDonald merely phoned in the information, Pryor agreed to come down to the Carmel police station to meet personally with Detective Locke where they talked for thirty to forty-five minutes. During this conversation, Pryor provided Detective Locke with Washburn's name, address and general description. Pryor also informed him that when he visited the residence two months earlier, he had seen evidence of cocaine. Additionally, Pryor elaborated that Washburn received his cocaine from a supplier on the West side and would distribute it "to females." (Tr. p. 10). Even though not all the information Pryor provided could immediately be corroborated, Detective Locke was able to substantiate the general gist of Pryor's assertions. Furthermore, Pryor supplied his name, date of birth, social security number, and telephone number. Thus, if he had supplied false information, Pryor could have been held responsible for it.

While we share Detective Locke's concern about Pryor's criminal history and motive to come forward with the information, we conclude that the totality of the circumstances establishes him as a reliable source. Detective Locke testified during the suppression hearing that upon questioning Pryor's motives, Pryor essentially shared that he came forward out of the spirit of good citizenship. Specifically, Detective Locke clarified that Pryor expressed concern about the cocaine source

in Indianapolis and that, if this source was stopped, Washburn's and Thompson's cocaine problems might end. Because of his face-to-face meeting with Pryor, Detective Locke could gauge first-hand Pryor's facial expressions, composure, tone of voice, and sincerity of his answers. There is no evidence that Pryor ever tried to cover up his criminal history or evade any of Detective Locke's questions. Therefore, after the meeting Detective Locke did not see any reason to doubt Pryor's veracity in coming forward with the information.

Accordingly, based on the evidence before us, we find that Pryor, as a concerned citizen, desired to assist law enforcement officials in solving a drug related crime. He was a reliable source, providing Detective Locke with information which amounted to an articulable individualized reasonable suspicion to search Washburn's trash. However, our inquiry does not end here.

### B. *Stale Information*

■ Washburn next contends that regardless of the reliability of Pryor's information, Detective Locke should not have acted upon it as the information was more than two months old, and thus, stale. "The general rule is that stale information cannot support a finding of probable cause. Stale information only gives rise to a mere suspicion and not reasonable belief, especially when the items to be obtained in a search are easily concealed and moved." *Raymer v. State,* 482 N.E.2d 253, 255 (Ind. 1985); *State v. Haines,* 774 N.E.2d 984, 990 (Ind.Ct.App.2002), *trans. denied.* However, when evaluating the legality of a trash pull, the burden of proof need not rise to probable cause, merely reasonable suspicion. *See Litchfield,* 824 N.E.2d at 363. While numerous Indiana cases have addressed the alleged staleness of facts shown as probable cause in an application for a search warrant, the parties do not proffer, and our research did not reveal

any, Indiana case law addressing the issue with regard to the reasonable suspicion requirement necessary for a trash pull.

 Reasonable suspicion is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Even though different, reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. *Id.* "Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

Accordingly, instead of reviewing the purported staleness of the information as a separate and independent factor to evaluate the reasonable suspicion requirement as Washburn urges this court to do, we find that, in light of the United States Supreme Court's case law, the better approach is to assess the age of the information as an element contributing to the totality of the circumstances.

 Here, a concerned citizen came forward with information about a possible drug crime, that was partially based upon his personal observation. Even though Pryor had seen cocaine in Washburn's residence two months before his meeting with Detective Locke, additional information established that cocaine would probably still be present in the residence. Pryor indicated that Washburn had an on-going cocaine habit, supported by a Westside supplier, and then distributed it to others in an ongoing practice. Thus, even though Pryor's personal observation was two months old, the reasonable inference deduced from its content gave rise to something more than an inchoate suspicion or hunch of criminal activity. *See Eshelman*, 859 N.E.2d at 748. Therefore, based upon the quantity and quality of Pryor's information, we conclude that the totality of the circumstances amounted to an articulable individualized reasonable suspicion, justifying Detective Locke in searching Washburn's trash.[2]

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly denied Washburn's Motion to Suppress evidence seized during the execution of a search warrant based on information obtained from a warrantless trash pull.

Affirmed.

NAJAM, J., and BARNES, J., concur.

---

**2.** Because Washburn failed to raise *Litchfield's* second prong—the method of trash retrieval—before the trial court, we find the issue waived for our review. *See Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 387 (Ind.Ct. App.2004). Even waiver notwithstanding, there is no evidence in the record establishing that the officers failed to follow the *Litchfield* guidelines when collecting Washburn's trash.