Craig E. TEAGUE, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 48A02–0711–CR–921.

Court of Appeals of Indiana.

Aug. 15, 2008.

William Byer, Jr., Byer & Byer, Anderson, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Craig E. Teague appeals his convictions for Dealing Cocaine,[1] as a class A felony, Maintaining a Common Nuisance,[2] a class D felony, and Possession of Marijuana,[3] a class A misdemeanor. While he presents three issues on appeal, we find the following restated issue dispositive: Did the trial court err by permitting the State to use Teague's prior silence to impeach his exculpatory story told for the first time at trial? Because the issue will almost certainly arise on retrial, we also address the propriety of the trash searches.

We reverse and remand.

In October 2006, Anderson Police Detective Kevin Early received information from a confidential informant regarding cocaine dealing at 1510 Dewey Street. Teague lived at this residence with his wife. On October 26, 2006, about one or two weeks after receiving the tip, Detective Early conducted a trash pull at the residence. The search of the trash revealed evidence of marijuana and several plastic baggies with the corners missing. Detective Early pulled trash from the same residence a week later. Again, he found marijuana and baggies with corners missing, as well as cocaine residue on some of the baggies. He also discovered a utility bill addressed to Teague at 1510 Dewey Street.

The following day, November 3, 2006, Detective Early sought and obtained a search warrant for the residence based upon the information provided by the confidential informant and the evidence discovered in the trash pulls. When members of the Madison County Drug Task Force knocked at the residence that evening to execute the warrant, it took Teague approximately two minutes to open the door. Inside the living room and kitchen of the residence officers recovered, among other things, a small amount of marijuana, a digital scale, four hundred sixty dollars,

---

1. Ind.Code Ann. § 35–48–4–1 (West, PREMISE through 2007 1st Regular Sess.).

2. I.C. § 35–48–4–13 (West 2004).

3. I.C. § 35–48–4–11 (West 2004).

a plate containing a razor blade and cocaine residue, and a spoon, knife, and glass measuring cup containing cocaine residue. After Teague was arrested and taken from the scene, officers search the detached garage at the residence. In the rafters of the garage, they found a loaded handgun and a bag containing over sixty grams of cocaine.

On November 6, 2006, the State charged Teague with dealing in cocaine, a class A felony, maintaining a common nuisance, a class D felony, and possession of marijuana, a class A misdemeanor.[4] On May 11, 2007, Teague filed a motion to suppress evidence found pursuant to the search warrant, claiming the warrant was procured following two unconstitutional trash searches. Following a suppression hearing, the trial court denied Teague's motion on June 20, 2007. Teague's three-day jury trial commenced on August 28, 2007. Teague unsuccessfully objected at trial to the admission of evidence obtained as a result of the alleged unconstitutional trash pulls and subsequent search of his residence.

At trial, the theory of Teague's defense was that Willie Ford, a convicted drug dealer, had been in Teague's garage and residence on the morning of the search. Teague testified in his own defense and explained that he was just a drug user, not a dealer, and that he and his wife had left and allowed Ford to "use" the residence for several hours on the day of the search. *Trial Transcript* at 382. Teague testified that he (Teague) often did this in exchange for drugs. Teague expressly denied

knowledge of the handgun and cocaine in his garage. Over Teague's vehement objection, the trial court allowed the State to inquire on cross-examination whether he had ever told his story to police before trial, which he had not. The jury found Teague guilty as charged, and he was subsequently sentenced to an aggregate term of forty years in prison. Teague appeals his convictions. Additional facts will be presented below as necessary.

1.

As set forth above, Teague testified at trial and implied that the cocaine found in the garage belonged to Willie Ford. He testified that Ford had been in the garage on the morning of the search and had also used Teague's home that day while Teague and his wife were gone. Over Teague's objection, the State was permitted to ask him on cross-examination whether he had shared this information with police anytime since the arrest and leading up to trial.

We initially observe that the State's entire argument with respect to this issue is based on the premise that the State's cross-examination questions "were directed at [Teague's] prearrest silence." *Appellee's Brief* at 8. We acknowledge that it is permissible to impeach a defendant at trial based upon his pre-arrest, pre-*Miranda* silence. *See Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). Contrary to the State's assertion on appeal, however, the challenged cross-examination testimony regarded Teague's post-arrest silence, not his pre-arrest silence.[5]

---

**4.** The State also alleged Teague was a habitual offender. The State did not pursue this count at trial.

**5.** The relevant part of the transcript reveals the following cross-examination testimony:

[State]: This version of events that you have told us yesterday and today, did you ever

share this with Detective Early anytime after your arrest on November 3rd, 2006? [Specific objection by defense counsel.]

[State]: Did you ever tell Detective Early what you just told us yesterday and today and any comment after your . . .

[Teague]: No because I didn't.

Teague asserts a *Doyle* violation. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In *Doyle*, the United States Supreme Court held that using a defendant's post-arrest, post-*Miranda* silence to impeach an exculpatory story told for the first time at trial violated the defendant's due process rights. *Id.* Rejecting the State's contention that it sought to use the defendant's silence for the limited purpose of impeachment on cross-examination, the Court noted that *Miranda* warnings give the criminal defendant implicit assurances that silence will carry no penalty. *Id.* Further, silence in the wake of these warnings may be nothing more than the arrestee's exercise of his *Miranda* rights. *Id.* "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. 2240. *See also Willsey v. State*, 698 N.E.2d 784, 792 (Ind.1998) ("the prosecution may not use a defendant's decision to stand mute in order to create an inference of guilt"). Thus, *Doyle* "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (quoting *South Dakota v. Neville*, 459 U.S. 553, 565, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)).

The instant case is different than *Doyle* in that the undisputed evidence establishes Teague did not receive his *Miranda* warnings at the time of his arrest. In *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), the Court held that the State's use of a defendant's post-arrest silence for impeachment purposes does not constitute a due process violation when the defendant did not receive *Miranda* warnings during the period of his post-arrest silence.[6] *See also Brecht*

---

[State]: I just, so the answer is no, so the answer is no to my question?

[Teague]: No.

[State]: Did you tell this version of events to Detective Cliff Cole?

* * *

[State]: Did you tell Detective Cole at anytime after your arrest what you just told the Jury here today, yesterday and today?

[Teague]: No sir I didn't.

[State]: Did you tell Sergeant Jeff Ash what you've been telling us yesterday and today?

[Teague]: No sir I didn't.

*Trial Transcript* at 481–83.

The State also made reference to Teague's post-arrest silence in its closing arguments to the jury:

[I]f you're Craig Teague and if you're just a drug user, you don't wait through November, December, January, February, March, April, May, June, July and August to come before you and say I'm just a drug user, it was actually Willie Ford. He was the one who was using my apartment. You say that up front that he didn't, he didn't. Why?

Because he wanted to see what the State's evidence was. That way he can try to come up with some kind of lie. You ever notice when you catch your kids, walk off in a room and they're doing something they shouldn't do and they're like trying to fabricate something really quick....

*Id.* at 518–19.

6. The Court explained:

In *Jenkins*, as in other post-*Doyle* cases, we have consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him. In *Roberts v. United States*, 445 U.S. 552, 561, 100 S.Ct. 1358, 1365, 63 L.Ed.2d 622 (1980), we observed that the post-conviction, presentencing silence of the defendant did not resemble "postarrest silence that may be induced by the assurances contained in *Miranda* warnings." In *Jenkins*, we noted that the failure to speak involved in that case occurred before the defendant was taken into custody and was given his *Miranda* warnings, commenting that no

*v. Abrahamson,* 507 U.S. 619, 628, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ("[s]uch silence is probative and does not rest on any implied assurances by law enforcement authorities that it will carry no penalty"). The State is precluded, however, from using a defendant's silence after any subsequent point in time that he was advised of his right to remain silent. *See id.* at 628–29, 113 S.Ct. 1710 ("the State's references to petitioner's silence after that point in time [when he received *Miranda* warnings at his arraignment], or more generally to petitioner's failure to come forward with his version of events at any time before trial, crossed the *Doyle* line") (internal citation omitted).

■ While Teague was not advised of his *Miranda* rights at the time of his arrest, it cannot be disputed that at the latest he would have been advised of his rights (significantly, his right to remain silent) at his initial hearing three days later. The State's questions on cross-examination and its closing argument to the jury were not limited to Teague's pre-*Miranda* silence.[7] Rather, the State specifically referenced Teague's entire period of pre-trial silence "through November,

December, January, February, March, April, May, June, July and August." *Trial Transcript* at 518–19. The State's questions and argument related to Teague's post-*Miranda* silence were impermissible under *Doyle. See Brecht v. Abrahamson,* 507 U.S. at 629, 113 S.Ct. 1710 ("due process is violated whenever the prosecution uses for impeachment purposes a defendant's post-*Miranda* silence"); *Bevis v. State,* 614 N.E.2d 599, 602 (Ind.Ct.App. 1993) ("we believe it is apparent on the face of these questions that they were unlimited, general questions directed without distinction to Mildred's silence both before and after she was given Miranda warnings. These questions were impermissible under *Doyle* ").

■ Because a *Doyle* violation is so egregious and so inherently prejudicial, reversal is the norm rather than the exception. *See Bevis v. State,* 614 N.E.2d 599. An error of this type is harmless only when the court, after assessing the record to determine the probable impact of the improper evidence on the jury, can conclude beyond a reasonable doubt that the error did not influence the jury's verdict.[8]

governmental action induced the defendant to remain silent before his arrest. 447 U.S., at 239–240, 100 S.Ct., at 2130. Finally, in *Anderson v. Charles,* 447 U.S. 404, 407–408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980), we explained that use of silence for impeachment was fundamentally unfair in *Doyle* because *"Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. ... *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances."

In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave

to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

*Id.* at 606–07.

7. We note that the police discovered the large quantity of cocaine supporting the dealing conviction in the garage after Teague was arrested and taken from the scene. Therefore, Teague's silence after he learned of the charges, as opposed to his silence at the time of his arrest, would have been particularly important in the State's attempt to impeach his testimony that the cocaine was not his and that he was unaware of its presence in the garage.

8. Our Supreme Court has adopted a nonexclusive, five-factor test to determine wheth-

*Bevis v. State,* 614 N.E.2d 599 (citing *Henson v. State,* 514 N.E.2d 1064 (Ind.1987) and *Yurina v. State,* 474 N.E.2d 93 (1985)). *See also Brecht v. Abrahamson,* 507 U.S. at 630, 113 S.Ct. 1710 (" 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt' ") (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). "The State bears the burden of proving that an error passes muster under this standard." *Brecht v. Abrahamson,* 507 U.S. at 630, 113 S.Ct. 1710. *See also Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (not addressing harmless error where State did not raise claim); *Kubsch v. State,* 784 N.E.2d 905, 916 (Ind. 2003) ("the State has not carried its burden in demonstrating that the references to Kubsch repeatedly invoking his right to silence are harmless beyond a reasonable doubt").

The State has wholly failed in its burden here, as it has simply asserted harmless error in passing without presenting us with any cogent argument. Under the circumstances, we cannot conclude beyond a reasonable doubt that the violation did not have some influence on the jury. Accordingly, we reverse Teague's convictions and remand for a new trial.

### 2.

Teague contends his convictions must be vacated because the warrantless trash pulls violated his right to be free from unreasonable search and seizure under article 1, section 11 of the Indiana Constitution. More specifically, he maintains that the evidence obtained from the trash pulls and from the subsequent search of his

residence should not have been admitted into evidence because the State failed to establish the officers had reasonable suspicion to search the trash and because the trash was not retrieved in substantially the same manner as a trash collector.

■ Initially, we observe that a trial court has broad discretion in ruling on the admissibility of evidence. *Turner v. State,* 878 N.E.2d 286 (Ind.Ct.App.2007), *trans. denied.* We will reverse a trial court's ruling on the admissibility of evidence only for an abuse of discretion. *Id.* An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.*

In *Litchfield v. State,* 824 N.E.2d 356 (Ind.2005), our Supreme Court held that under the Indiana Constitution it is unreasonable for police to search indiscriminately through people's trash. The Court concluded:

A search of trash recovered from the place where it is left for collection is permissible under the Indiana Constitution, but only if the investigating officials have an articulable basis justifying reasonable suspicion that the subjects of the search have engaged in violations of law that might reasonably lead to evidence in the trash.

*Id.* at 357. Thus, *Litchfield* announced a two-part test for determining whether a trash search is reasonable: 1) the search must be based upon an "articulable individualized suspicion [that illegal activity is or has been taking place], essentially the same as is required for a 'Terry stop' of an automobile" and 2) the trash must be retrieved in substantially the same manner

---

er a *Doyle* violation is harmless: 1) the use to which the prosecution puts the post-arrest silence; 2) who elected to pursue the line of questioning; 3) the quantum of other evidence indicative of guilt; 4) the intensity and frequency of the reference; and 5) the availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions. *Bieghler v. State,* 481 N.E.2d 78 (Ind.1985).

as the trash collector would take it. *Id.* at 364.

We turn first to the method of trash collection used by police in this case. The evidence reveals that in both instances the trash had been set out by the alley for regular collection and was taken by police late on the night before regular trash collection. Further, no one was disturbed during the trash pulls. Thus, it is clear that the police retrieved the trash in *substantially* the same manner as the trash collector would take it.[9] *See id.* at 364 ("the seized trash was left in barrels on the property in its regular place for collection . . . .the police acted reasonably by quickly and quietly retrieving the trash from the place it was ordinarily collected without creating undue embarrassment or indignity").

The question remains whether police had the requisite reasonable suspicion that Teague was involved in criminal activity. The reasonable suspicion standard is less demanding than probable cause and requires a showing considerably less than a preponderance of the evidence, but it still requires at least a minimal level of objective justification and more than an inchoate and unparticularized suspicion or hunch of criminal activity. *Washburn v. State*, 868 N.E.2d 594 (Ind.Ct.App.2007), *trans. denied; see also Turner v. State*, 878 N.E.2d 286. When reviewing a determination of reasonable suspicion to support a warrantless search, the court examines the totality of the circumstances to see whether the officer had a particularized and objective basis for suspecting legal wrongdoing. *Washburn v. State*, 868

N.E.2d 594. The reasonable suspicion requirement is satisfied when the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. *Id.; see also Turner v. State*, 878 N.E.2d at 293 ("what matters is whether the totality of the circumstances reasonably could create a suspicion of criminal activity based on common sense and the police officer's training and experience"). The determination of reasonable suspicion is reviewed de novo. *Richardson v. State*, 848 N.E.2d 1097 (Ind.Ct.App.2006), *trans. denied.*

In the instant case, Teague appears to argue that Detective Early did not have reasonable suspicion of criminal activity at the residence. Specifically, he contends that Detective Early relied on stale information from an unreliable confidential informant to support the trash search.

The trustworthiness of hearsay from an informant can be established in a number of ways, including where (1) the informant has given correct information in the past; (2) independent police investigation corroborates the informant's statements; (3) some basis for the informant's knowledge is shown; *or* (4) the informant predicts conduct or activities by the suspect that are not ordinarily easily predicted. *Scott v. State*, 883 N.E.2d 147 (Ind.Ct.App.2008). Where a tip from a confidential informant is "completely lacking in indicia of reliability and the record offers no evidence that the confidential informant was reliable[,] the tip [is] . . . inadequate"

---

**9.** To the extent Teague asserts the police were required to retrieve the trash in the same manner as the trash collectors (i.e., with the trash truck), we observe that our Supreme Court has specifically held otherwise. *See id.* at 364 ("police need not. . .r[i]de in the trash pickup and search[ ] [trash] only after it [is] taken by its usual collectors. But police do need to ensure that they do not cause a disturbance or create the appearance of a police raid of the residence").

to establish reasonable suspicion. *Johnson v. State*, 659 N.E.2d 116, 119 (Ind. 1995).

Here, the record reveals substantial evidence supporting Detective Early's opinion that the confidential informant in the instant case was reliable. In this regard, Early testified that he received the information of drug activity at Teague's residence from a long-time confidential informant who had provided reliable information several times in the past, which had led to a number of drug-related arrests and convictions. Specifically, Early explained that the informant was not working off charges and had provided reliable information at least six or seven times over the last four to five years, with the most recent reliable information being provided within the last year or six months. In addition to providing reliable information on drug dealers in the area, the confidential informant had also previously participated in an uncontrolled buy that led to a guilty plea. This evidence sufficiently established that the confidential informant in this case was reliable.[10] *See Scott v. State*, 883 N.E.2d 147 (reliability of informant and trustworthiness of informant's information may be established where informant has given correct information in the past); *cf. Johnson v. State*, 659 N.E.2d at 119 ("the record reveals no reason for regarding the informant as reliable. Officer Zirkelbach did not claim that a single conviction had ever resulted from one of this informant's 'tips' ").

 As set forth above, Teague also challenges the staleness of the information used to support the trash search, as the first search was not conducted until one or two weeks after Detective Early received information from the confidential informant regarding crack cocaine sales on several occasions at Teague's residence. In *Washburn*, we addressed staleness in the context of reasonable suspicion, as opposed to probable cause, and explained:

> "The general rule is that stale information cannot support a finding of probable cause. Stale information only gives rise to a mere suspicion and not reasonable belief, especially when the items to be obtained in a search are easily concealed and moved." *Raymer v. State*, 482 N.E.2d 253, 255 (Ind.1985); *State v. Haines*, 774 N.E.2d 984, 990 (Ind.Ct. App.2002), *trans. denied*. However, when evaluating the legality of a trash pull, the burden of proof need not rise to probable cause, merely reasonable suspicion. *See Litchfield*, 824 N.E.2d at 363. While numerous Indiana cases have addressed the alleged staleness of facts shown as probable cause in an application for a search warrant, the parties do not proffer, and our research did not reveal any, Indiana case law addressing the issue with regard to the reasonable suspicion requirement necessary for a trash pull.

Reasonable suspicion is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that

---

**10.** Teague directs us to *Richardson v. State,* 848 N.E.2d 1097, a case in which we held that an anonymous tip lacked sufficient indicia of reliability to justify a trash search because police were unable to corroborate significant aspects of the tip and the tipster failed to demonstrate an intimate familiarity with the suspect's affairs or an ability to predict future behavior. The information in the case before us, however, came from a known, reliable informant, not an anonymous tipster. Therefore, *Richardson* is inapposite.

required to show probable cause. *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Even though different, reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. *Id.* "Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

Accordingly, instead of reviewing the purported staleness of the information as a separate and independent factor to evaluate the reasonable suspicion requirement as Washburn urges this court to do, we find that, in light of the United States Supreme Court's case law, the better approach is to assess the age of the information as an element contributing to the totality of the circumstances.

*Washburn v. State*, 868 N.E.2d at 600–01. Considering the totality of the circumstances, we found that although the informant's personal observations were two months old, the informant's information established reasonable suspicion for the trash search. *See Washburn v. State*, 868 N.E.2d 594 (informant reported to police that he had seen cocaine in defendant's residence two months prior and that defendant had an on-going cocaine habit and regularly distributed cocaine obtained from a west-side supplier).

Here, approximately one or two weeks before the initial trash pull, Detective Early received information from a reliable source regarding cocaine dealing out of Teague's residence. The informant, who received no incentive for providing information to police, specifically reported that she went to the residence on several occasions with another individual who purchased crack cocaine there. In light of the informant's reliability and her indication of on-going drug sales at Teague's residence, we find that the totality of the circumstances gave rise to an articulable and individualized reasonable suspicion of criminal activity, justifying Detective Early's search of the trash from the residence. *See id.* As a result, we conclude that the evidence seized pursuant to the trash pulls and the subsequent search warrant was properly admitted at trial.[11]

Judgment reversed and remanded.

KIRSCH and BAILEY, JJ., concur.

---

11. We do not decide the issue of whether the trial court properly precluded Teague from calling Ford or Ford's attorney as a witness for the sole purpose of asserting Ford's Fifth Amendment privilege in the presence of the jury. We observe, however, that our Supreme Court has recognized (in a different context) that the use of an individual's refusal to testify to bolster the defense theory that such individual was the actual perpetrator is a reasonable defense strategy. *See Johnson v. State*, 719 N.E.2d 812 (Ind.1999). Moreover, while it has long been held to be improper for the State to knowingly call a codefendant or an accomplice who will invoke the Fifth Amendment on the stand, *see Aubrey v. State*, 261 Ind. 692, 310 N.E.2d 556 (1974), we are unaware of any authority so limiting a defendant.