**Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not
be regarded as precedent or cited
before any court except for the
purpose of establishing the defense of
res judicata, collateral estoppel, or the
law of the case.**



ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHARLES K.CORN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 84A01-1304-CR-161 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable John T. Roach, Judge
Cause No. 84D01-1209-FB-2978

**April 24, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Judge**

<u>Case Summary and Issues</u>

Following a jury trial, Charles Corn was convicted of aggravated battery, a Class B felony. Corn raises two issues on appeal which we restate as: 1) whether comments at trial on Corn's invocation of his right to an attorney and subsequent silence amounted to fundamental error, and 2) whether the State presented sufficient evidence to disprove Corn's claim of self-defense. Concluding any reference to Corn's silence was harmless and the State sufficiently disproved Corn's claim of self-defense, we affirm.

<u>Facts and Procedural History</u>[1]

Corn resided on Donald Clark's property in Terre Haute. Clark allowed Corn to pitch a tent against the backside of Clark's house and use the kitchen, utensils, and bathroom in the house as needed. Corn, without Clark's permission, connected a jump wire to route electricity to his tent. On September 8, 2012, Clark asked James Brown to talk to Corn about removing the wire. Around 4 p.m. that day, Brown confronted Corn about the wire. Corn, who had been drinking from a gallon-sized jug of vodka all day, started yelling profanities at Brown for getting involved. The altercation soon became physical, and Brown "knocked the crap" out of Corn. Transcript at 319. Another man interceded and convinced Brown to stop. As Corn was walking back to his tent, he continued to yell profanities at Brown and called Brown a "bastard," <u>id.</u> at 449, at which point Brown knocked Corn to the ground and kicked him at least once or twice. The fight ended, and the two shook hands then went their separate ways.

---

[1] We held oral argument on this matter on March 27, 2014, at Indiana State University. We thank the faculty, staff, and students for their hospitality and commend counsel for the quality of their oral advocacy.

About four hours later, around 8:30 p.m., Clark and Brown were sitting in Clark's parked van in the driveway. Corn approached Clark to talk and then saw that Brown was seated in the passenger seat. Corn asked to speak to Brown, and Brown made a comment to the effect of, "[W]ell, you want some more of what you got earlier," id. at 321, while approaching Corn very quickly. Brown did not have his fists up or any weapons on him when he approached Corn. Corn had an eight inch kitchen knife in his hand and stabbed Brown in the stomach before anyone could react. After he was stabbed, Brown grabbed a gun from the van but switched to a sledge hammer when he realized the gun was unloaded. Brown tried to swing the sledge hammer a couple times but dropped it as he walked towards his sister's house across the alley. Corn and Robert King, an acquaintance who happened to be at Clark's house, got into Clark's van, and Clark drove the two men to Taylorsville before returning home.[2] Clark only drove the men because Corn still was holding the jug of vodka and the knife, and Clark was concerned about what Corn would do if he refused. Police found Corn walking down a street in Taylorsville with the bloody kitchen knife stuck in his front pocket. Corn was arrested, and reported no physical injuries or pain from either the afternoon or evening fight that needed to be evaluated by medical staff when he was booked at the jail.

On September 11, 2012, the State charged Corn with aggravated battery. Corn was tried before a jury on February 25-27, 2013, and he was found guilty as charged. Corn now appeals. Additional facts will be provided as necessary.

---

[2] King was trying to get Clark to take him to Taylorsville before the stabbing occurred.

## Discussion and Decision

### I. Doyle Violation

#### A. Standard of Review

Corn argues statements by Detective Long, defense counsel, and the prosecutor during direct examination, cross-examination, and closing argument, respectively, improperly commented on his right to silence in violation of Doyle v. Ohio, 426 U.S. 610 (1976), and were so prejudicial as to warrant relief. In Doyle, the Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Id. at 619. However, it is not an error when the jury is aware of the defendant's invocation of his right to remain silent when that knowledge is not used to subvert the defense. Mendenhall v. State, 963 N.E.2d 553, 565 (Ind. Ct. App. 2012), trans. denied. Since Corn did not object at trial, he relies on the extremely narrow doctrine of fundamental error.

> A fundamental error is a substantial, blatant violation of basic principles of due process rendering the trial unfair to the defendant. It applies only when the actual or potential harm cannot be denied. The error must be so prejudicial to the rights of a defendant as to make a fair trial impossible.

Trice v. State, 766 N.E.2d 1180, 1182 (Ind. 2002) (citations and internal quotations omitted). A Doyle violation is inherently prejudicial, so reversal is the norm rather than the exception. Teague v. State, 891 N.E.2d 1121, 1126 (Ind. Ct. App. 2008). "An error of this type is harmless only when the court, after assessing the record to determine the probable impact of the improper evidence on the jury, can conclude beyond a reasonable doubt that the error did not influence the jury's verdict." Id. Our supreme court has

4

adopted a non-exclusive, five-factor test to determine whether the Doyle violation is harmless: 1) the use to which the prosecution puts the post-arrest silence; 2) who elected to pursue the line of questioning; 3) the quantum of other evidence indicative of guilt; 4) the intensity and frequency of the reference; and 5) the availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions. Bieghler v. State, 481 N.E.2d 78, 92 (Ind.1985), cert. denied, 475 U.S. 1031 (1986).

### B. Comments on Corn's Post-Arrest Silence During Case-in-Chief

During the State's case-in-chief, the State had the following exchange with Detective Long:

Q: Did you also interview the defendant Charles Corn and see him after he was arrested?
A: I did not have the opportunity to interview him. I went in and spoke to him and he advised me at that point he wanted an attorney, so I wasn't allowed to ask him any further questions, but yes I did observe him and speak to him in that manner.

Tr. at 570-71. Defense counsel followed up on those questions on cross-examination with the following:[3]

Q: You were not the one that interviewed [Corn]?
A: No, I said I did attempt to interview him, but –
Q: But he asked for an attorney.
A: That's correct.

Tr. at 575. Corn contends that as a whole, this was an improper line of questioning and the prejudice was great because the court failed to give curative jury instructions regarding the right to remain silent. The State argues it was not using this comment to

---

[3] The State argues that these statements on cross-examination were invited error, and that invited error is not a fundamental error. Brief of the Appellee at 9. In the context of this case, we decline to find the curative statements made by defense counsel on cross-examination after the State had commented on Corn's silence, with the same witness, as invited error.

5

impeach Corn; rather, this line of questioning was elicited to show Corn had no visible injuries from the afternoon fight, and thus discredit his claim of self-defense:

> Q: Did you inspect him, see him, examine him from the standpoint of looking at him at that time?
> A: Yes. I was in the same small room with him.
> Q: Tell me whether he showed any outward signs of injury on his face, arms, hands, anything you could see that indicated there was any evidence of an injury that was visible to you.
> A: I did not see any visible injuries at all.

Tr. at 571. We agree with Corn that the State's question constituted a Doyle violation. Despite the State's argument that the question was actually if the detective had seen Corn and was able to observe any injury, that is not what was asked. The error was compounded by defense counsel's follow up question. We now must consider these statements in the context of the Bieghler factors to determine whether the admission of such statements was harmless.

## 1. Use

The comments were not used to impeach Corn's exculpatory testimony. Detective Long's testimony was to explain his knowledge that Corn was not injured or complaining of injury when he was booked into jail, and defense counsel's cross-examination was a follow-up to the State's question.

## 2. Who Elected to Pursue Questioning

The statements made during Detective Long's examination were made by both the State and defense, and each side made the statements once.

### 3. Quantum of Other Evidence of Guilt

It is undisputed that Corn stabbed Brown; the case was simply a matter of self-defense. There was ample other evidence of Corn's guilt, including testimony from several witnesses.

### 4. Intensity and Frequency of the Reference

The references to Corn's silence were brief and made in passing. Both sides, in questioning Detective Long, made one reference to Corn asking for an attorney, and then moved on with their questioning without revisiting the topic. In the context of a three-day trial, the references were infrequent and very slight.

### 5. Opportunity to Give Curative Instructions

Corn did not request a mistrial based on these statements. He had the opportunity to present curative final instructions to the jury. Corn raised his concerns about the statements to the trial court and asked if there was a pattern jury instruction that an inference of guilt could not be made from the fact that the defendant asked for an attorney. The court was willing to offer an instruction but found no such pattern in its own search. The court also offered to give an appropriate instruction supported by case law if Corn provided one. The State agreed that such an instruction would be appropriate and that if Corn wanted to argue that position during closing arguments, the State would not argue the contrary position. Corn did not present any such instruction for the court's review, nor did he make any statements during closing arguments to this effect. The instruction was therefore not given.

Given the infrequency of the statements, the relatively minor references, the opportunity for Corn to give curative instructions to the jury and opportunity to advance

any argument in closing argument on the topic, the <u>Doyle</u> violation during the State's case-in-chief, compounded by defense counsel's follow up, question was harmless.

### C. Comments During Closing Arguments

Corn also makes an argument that part of the prosecutor's closing argument amounted to a <u>Doyle</u> violation. In closing, the prosecutor stated:

> [Corn] wants your sympathy. He wants you to think that he was hurt so bad, it justifies virtually killing somebody. He, he's a fraud. He's made this up as a defense saying, I was so injured that I couldn't do anything but stab the guy back. That's the defense argument in this case. Said I couldn't possibly defend myself because I was so impaired I couldn't do anything but kill him or stab him. . . . He's saying, I'm going to get him. I'm going to kill him. That's what he was saying. And he just about did.

Tr. at 786. These statements do not amount to a <u>Doyle</u> violation. The references to Corn's defense are based on Corn's theory of the case: that Corn was beat up earlier in the day by Brown, so he reasonably feared great bodily injury during the confrontation at night; this then justified Corn's use of self-defense. Further, the comment of "I'm going to get him. I'm going to kill him," was a recap of Robert King's testimony at trial, though inartfully worded since it did not attribute the statements to the witness. Since neither of these statements improperly commented on Corn's silence for impeachment purposes, there was no <u>Doyle</u> violation.

### II. Self-Defense

### A. Standard of Review

Corn next argues the State failed to rebut his claim of self-defense. Our standard of review is as follows:

> The standard of review for a challenge to the sufficiency of the evidence to rebut a claim of self defense is the same as the standard for any sufficiency of the evidence claim. We do not reweigh the evidence or judge the

8

credibility of the witnesses. We consider only the probative evidence and reasonable inferences drawn from the evidence that support the verdict. If a defendant is convicted despite a claim of self defense, we reverse only if no reasonable person could say that self defense was negated by the State beyond a reasonable doubt.

Bryant v. State, 984 N.E.2d 240, 250 (Ind. Ct. App. 2013) (citations omitted), trans. denied.

## B. Corn's Self-Defense Claim

To prevail on a claim of self-defense, Corn had to present evidence that he: (1) was in a place he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. Id. The State then had the burden of disproving at least one of the elements beyond a reasonable doubt. Mateo v. State, 981 N.E.2d 59, 72 (Ind. Ct. App. 2012), trans. denied.

It is undisputed that Corn had the right to be on Clark's property that night. Corn argues that he did not provoke, instigate, or participate willingly in the violence because Corn simply stated he wanted to talk to Brown, and Brown instigated by saying something like "[W]ell, you want some more of what you got earlier." Tr. at 321. Corn also argues that he had a reasonable fear of death or great bodily harm because Brown is much larger, Corn has a number of health issues, and Brown had already beaten him up that day.

Corn has not met the high burden of proving no reasonable person could say the State failed to disprove at least one of the elements of self-defense beyond a reasonable doubt. A reasonable person could have determined Corn provoked, instigated, or willingly participated in the evening fight. The State offered several witnesses who testified about the stabbing and Corn calling Brown out of the van. Witnesses also

9

testified about seeing no physical threat from Brown before Corn stabbed him. A reasonable person could also have concluded the State proved beyond a reasonable doubt it was unreasonable for Corn to fear great bodily harm or death, because even if Brown did intend to give Corn "some more of what [he] got earlier," tr. at 321, the fight, like those in the afternoon, would not be so severe as for Corn to need medical attention or be motivated to call the police.

## Conclusion

Concluding any reference to Corn's silence was harmless and the State sufficiently disproved Corn's claim of self-defense, we affirm.

Affirmed.

RILEY, J., and BRADFORD, J., concur.