

**FILED**

Jan 14 2021, 8:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Marietto V. Massillamany
Erica L.S. Guernsey
Massillamany Jeter & Carson LLP
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Daveon L. Hendricks,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 14, 2021

Court of Appeals Case No.
20A-CR-690

Appeal from the Delaware County
Circuit Court

The Honorable Marianne L.
Vorhees, Judge

Trial Court Cause No.
18C01-1708-MR-6

**Sharpnack, Senior Judge.**

## Statement of the Case

[1]     Daveon L. Hendricks agreed to join his cousin and several friends in robbing two acquaintances who dealt in marijuana. One of the victims was fatally shot

during the attempted robbery. Hendricks appeals his convictions of murder, a felony,[1] and conspiracy to commit robbery resulting in serious bodily injury, a Level 2 felony.[2] We affirm in part, reverse in part, and remand.

## Issues

Hendricks raises four issues, which we expand and restate as:

I. Whether the trial court erred in allowing a witness to testify about a co-conspirator's confession.

II. Whether the trial court erred in admitting into evidence recordings of Hendricks' jail telephone conversations.

III. Whether the trial court erred in admitting into evidence witness identifications of Hendricks.

IV. Whether there is sufficient evidence to sustain Hendricks' convictions.

V. Whether Hendricks' convictions violate Indiana's constitutional prohibition of double jeopardy.

---

[1] Ind. Code § 35-42-1-1 (2014).

[2] Ind. Code §§ 35-42-5-1 (2014) (robbery), 35-41-5-2 (2014) (conspiracy).

## Facts and Procedural History

[3]     C.O. and S.J. were longtime friends,[3] and in the summer of 2015 they lived together in a house in Muncie, Indiana. A mutual friend, Andre Wells, slept in the house's garage. C.O. and S.J. both sold marijuana at the house.

[4]     S.J. knew Hendricks, William Balfour, Darius Covington, and Artie Thomas from school and from encountering them in Muncie on several different occasions.[4] Hendricks and Balfour were cousins.

[5]     In June 2015, Hendricks purchased marijuana from C.O. at C.O. and S.J.'s house. During the last week of June 2015, Balfour went to the house on a separate occasion, as part of a group that sold a rifle to C.O. Balfour had jointly owned the rifle with Jonathan Kerr and another person, and C.O. paid $300 to Balfour for his share of the rifle. A few days later, Balfour called Kerr to express dissatisfaction with the amount of money C.O. had paid him.

[6]     On June 30, 2015, Balfour texted C.O. to ask if he had any marijuana, to which C.O. responded that he did not. On July 1, 2015, Balfour texted C.O. to say that he needed "some licks." Tr. Ex. Vol., State's Ex. 51. A "lick" is slang for

---

[3] Both were under the age of eighteen, which is why we refer to them using initials. *See* Ind. Code § 35-40-5-12 (2019) (in court documents open to the public, child victims of violent crimes shall be identified by means other than their names).

[4] Hendricks was fifteen years old, and Balfour, Covington, and Thomas were under eighteen years of age.

a robbery. Balfour further stated he was interested in "[a]nything that got [sic] money involved." *Id.*

[7] On July 2, 2015, at around 6 p.m., Thomas, Covington, and Jamel Barnes (who was also under the age of eighteen) were playing basketball at a Muncie apartment complex when Hendricks and Balfour arrived. Hendricks is approximately six feet tall, and on that day he styled his hair in dreadlocks. The five young men stayed at the basketball court until nightfall, when they left in Barnes' car.

[8] Hendricks and Balfour suggested going to C.O. and S.J.'s house to buy marijuana. At some point during the drive, Covington borrowed Thomas' phone and kept it. Also, the group discussed robbing C.O. instead of buying drugs.

[9] Upon arriving at the house at around 10:30 p.m., Covington, Thomas, Hendricks, and Balfour agreed that Covington and Thomas would go into the house while Hendricks, Balfour, and Barnes stayed in the car. Covington and Thomas rarely smoked marijuana, and, unlike Hendricks and Balfour, neither of them had been to C.O. and S.J.'s house before. Covington later testified that as he approached the house, he believed that he and some or all of his companions had agreed to rob the occupants.

C.O. allowed Covington and Thomas to enter. S.J. was present, but Wells was absent. Covington went with C.O. to C.O.'s bedroom to look at a rifle and a handgun while S.J. and Thomas discussed a marijuana deal in the living room.

Next, Covington went to the restroom, leaving C.O., S.J., and Thomas in the living room. Telephone company records for Thomas' phone, which was in Covington's possession during this time, demonstrate that a person using Barnes' phone called Thomas' phone at 10:40 p.m., and the call lasted until approximately 10:51 p.m. After the call ended, two men entered the house, wearing hooded jackets with the hoods up, and wielding handguns. One of the intruders was about six feet tall, and his hair was in dreadlocks. S.J. later stated:

> I'd say [Hendricks] entered the house. I didn't know who it was. Whenever someone came into the house, I thought it was – like I didn't know who it was. I just said someone with dreads, about 5'11, black. But I'd say [Hendricks] entered the house.

Tr. Vol. 2, p. 98. Thomas also later identified Hendricks as one of the intruders and further stated Balfour was his companion.

One of the intruders pointed his gun at S.J. and ordered everyone to get on the floor. S.J. jumped into his bedroom and heard a gunshot. Similarly, Thomas jumped into C.O.'s bedroom and heard a gunshot. Covington, still in the restroom, also heard a gunshot.

[13] Meanwhile, Hendricks and Balfour had left Barnes' car. When they returned after ten minutes, Barnes asked about Covington and Thomas. Hendricks and Balfour indicated Covington and Thomas were at the same place they had come from. Barnes drove off with Hendricks and Balfour, leaving Covington and Thomas behind.

[14] Next, Covington left the restroom and did not see anyone in the living room, so he ran out of the house. Thomas exited C.O.'s bedroom and also left the house.

[15] S.J. texted Wells at 10:53 p.m. to say that he was being robbed. In response, Wells called S.J. who, after staying on the floor of his bedroom for several minutes, got up and walked through the house as he spoke with Wells. No one else was there, but S.J. found C.O. in a utility room at the back of the house. C.O. was on the ground, nonresponsive and bleeding from a gunshot wound. S.J. hung up on Wells and called 911.

[16] 911 records show S.J.'s call was received at 10:57 p.m. Officers from the Muncie Police Department arrived within minutes. They determined no one other than S.J. was in the house. C.O. did not appear to be breathing and was later pronounced dead.

[17] Meanwhile, upon leaving the house, Covington saw that Barnes' car was gone, so he ran away, traveling several miles on foot. He still had Thomas' phone, and he eventually called his sister's boyfriend to pick him up and take him

home. During this time period, Covington also called Hendricks, and Barnes called Covington.

[18] When Thomas exited the house, he also saw that Barnes' car was gone. He went to a nearby bar to use the phone, but he was denied service because he was underage. Next, Thomas went to a nearby house and used the resident's phone to call Barnes. Barnes came back and picked him up. Hendricks and Balfour were in the car with Barnes.

[19] Barnes drove to Hendricks and Balfour's grandfather's house. On the way there, Barnes heard Balfour ask Hendricks "why [C.O.] ran." Tr. Vol. 4, p. 85. He also heard Balfour ask Hendricks if "they got anything from the house." *Id.* at 86. Balfour and Hendricks got out of the car at their grandfather's house. Barnes and Thomas then went to Covington's home, where Thomas retrieved his phone. Thomas discovered that his phone's call logs and text logs had been deleted.

[20] A crime scene technician examined C.O. and S.J.'s house. He found a .9 mm shell casing on the living room floor, near the front door. The technician also discovered a bullet on the floor in the kitchen in a doorway to the utility room where C.O.'s body was found. A subsequent autopsy revealed C.O. had died from a gunshot wound to the back. The round went through his spine, aorta, and heart before exiting his chest.

[21] On July 4, Barnes encountered Hendricks, Balfour, and Covington at a fireworks event. Balfour stated that he had heard Thomas had talked to the police, and he threatened to kill anyone else who talked to the police.

[22] In 2017, the State charged Hendricks with murder, a felony, alleging that Hendricks and/or Balfour robbed or attempted to rob C.O. and that C.O. was killed in the commission of the robbery or attempted robbery. The State also charged Hendricks with conspiracy to commit robbery resulting in serious bodily injury, a Level 3 felony, alleging that C.O. suffered serious bodily injury as a result of the conspiracy.[5]

[23] In early 2019, Hendricks asked Covington to contact Balfour. Balfour was in jail, so Covington used a jail-managed app to speak with him. Covington was aware the calls were recorded, so when he set up an account on the app, he used a false name to hinder the authorities from finding the recordings of the calls in the app's database. Covington and Balfour talked about Thomas, Barnes, and other people using code names to hinder any attempts to decipher their conversations.

---

[5] The State also charged Hendricks with attempted robbery resulting in serious bodily injury, a Level 2 felony, but dismissed that charge prior to trial. In addition, the State later charged Hendricks with conspiracy to commit obstruction of justice, a Level 6 felony, but that charge was severed from the others prior to trial, and it is not part of this appeal.

In May and June of 2019, Hendricks had three recorded calls with Balfour. They discussed other people using code names such as "J.B.," "D.C.," and "Lacy." Tr. Ex. Vol., State's Ex. 86, 92. Balfour told Hendricks he had contacted various people. Balfour urged him to keep speaking with an unidentified person to keep him "on the team." *Id.* at State's Ex. 92. On another call, Hendricks said he had spoken with someone about an unspecified task Hendricks and Balfour had apparently discussed in the past, but Hendricks refused to provide details on the phone, saying: "he doing [sic] it. You feel me? It still ain't got to be explained." *Id.* at State's Ex. 90.

The trial court presided over a jury trial on October 28 through 31, 2019. The jury determined Hendricks was guilty of murder and conspiracy to commit robbery resulting in serious bodily injury. The trial court imposed concurrent sentences of fifty-five years and seventeen and one-half years, respectively, and this appeal followed.

## Discussion and Decision

### I. Admission of Witness Testimony About a Co-Conspirator's Confession

During trial, the State presented testimony from Darius Covington's sister, Brionna Covington ("Brionna"). She told the jury, over Hendricks' objection, that Balfour had told her he was involved in C.O.'s shooting. Hendricks argues that allowing Brionna to testify as to what Balfour told her violated his right to

confront witnesses under the federal and state constitutions. He further claims her statement was inadmissible because it was irrelevant, unduly prejudicial, and hearsay.

[27] The State claims Hendricks has waived most of his challenges to the admission of Brionna's testimony. A contemporaneous objection at the time evidence is introduced at trial is required to preserve an issue for appeal. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Further, a defendant may not raise one ground for objection at trial and argue a different ground on appeal. *Willsey v. State*, 698 N.E.2d 784, 793 (Ind. 1998).

[28] At trial, Hendricks' only objection to Brionna Covington's statement was on grounds of hearsay. His other challenges to the admission of the statement are procedurally defaulted, but we will address Hendricks' hearsay claim.

[29] We review a trial court's evidentiary rulings for an abuse of discretion. *Fairbanks v. State*, 119 N.E.3d 564, 567 (Ind. 2019). Under that standard, we reverse only when the admission is clearly against the logic and effect of the facts and circumstances. *Id.* at 568.

[30] Hearsay is a "statement that . . . is not made by the declarant while testifying at the trial court hearing . . . and is offered in evidence to prove the truth of the matter asserted." Ind. Evid. R. 801(c). In general, hearsay is inadmissible. Ind. Evid. R. 802. Brionna's testimony about Balfour's statement, which was admitted for the truth of the matter asserted, qualifies as hearsay.

Our analysis is not yet complete because the Indiana Rules of Evidence provide exceptions to the rule that hearsay is inadmissible. One exception is for a statement against interest, which is defined in relevant part as: "[a] statement that a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, . . . [it] expose[d] the declarant to civil or criminal liability."[6] Ind. Evid. R. 804(b)(3). A statement against interest must be incriminating on its face to be admissible under this exception. *Webb v. State*, 149 N.E.3d 1234, 1240 (Ind. Ct. App. 2020). Balfour's admission to Brionna that he was involved in C.O.'s fatal shooting meets the definition of this exception. *See Beasley v. State*, 46 N.E.3d 1232, 1237 (Ind. 2016) (trial court did not err in admitting witness's testimony that another person had told him he shot someone; the person's statement exposed him to criminal liability).

Hendricks notes that the exception that permits the admission of statements against interest also contains a limitation: "A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused, is not within this exception." Ind. Evid. Rule 804(b)(3). The key question is whether Balfour's statement to

[6] This exception applies only when the declarant, in this case Balfour, is unavailable to testify at trial. Ind. Evid. Rule 804. Neither of the parties appears to dispute that Balfour was unavailable.

Brionna about his misconduct also implicates Hendricks, even though Balfour's statement did not refer to Hendricks.

[33] In *Payne v. State*, 854 N.E.2d 7, 11 (Ind. Ct. App. 2006), Payne allegedly told several men how they could circumvent the security system of a specific house, enabling them to enter it without detection. When the men arrived at the house (without Payne), they encountered three workmen, and they murdered them before entering the house via the method Payne described. Payne was convicted of three counts of murder.

[34] On appeal, Payne claimed the trial court should not have admitted into evidence a video recording of one of the shooters, in which he demonstrated for police officers how he and three companions committed the murders and then entered the house. Payne argued that the shooter's statements and acts in the recording implicated her in wrongdoing, even though the shooter did not mention her. The Court, considering all the evidence presented at trial, concluded: (1) the jury had already heard, through other evidence, how the men entered the house; (2) the only purpose for admitting the recording was to implicate Payne by showing the burglary occurred in accordance with her instructions. As a result, the recording was inadmissible under Rule 804(b)(3).

[35] In this case, the jury heard other evidence establishing that Balfour was involved in the conspiracy to rob C.O. and S.J., as well as C.O.'s death. Further, other evidence demonstrated that Hendricks and Balfour were together

throughout the night of July 2.  As a result, the only purpose in admitting Brionna's testimony was to implicate Hendricks along with Balfour.  We conclude, as the Court did in *Payne*, that her statement was inadmissible under Indiana Evidence Rule 804(b)(3).

[36]   Although admitting Brionna's testimony was erroneous, Indiana Appellate Rule 66(A) provides:

> [n]o error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all of the evidence in this case, is sufficiently minor so as not to affect the substantial rights of the parties.

[37]   After reviewing the evidence presented, which we discuss in more detail below, we conclude the erroneous admission of Balfour's hearsay statement did not affect Hendricks' substantial rights.  Balfour's statement to Brionna incriminated Hendricks only by implication, not directly.  Further, at trial Barnes described other statements by Balfour that put him (and by implication, Hendricks) in an incriminating light, including asking why C.O. ran and whether Hendricks took anything from the house.  Finally, other witnesses identified Hendricks as one of the armed intruders who entered the house.  The admission of Brionna's statement was harmless error that does not require reversal.

# II. Admission of Recorded Telephone Calls

[38] Hendricks argues the trial court erred in admitting three recordings of jail telephone calls between himself and Balfour from May and June of 2019. He argues the recordings were irrelevant, were more unfairly prejudicial than probative, and were hearsay. Hendricks further claims that admission of the recordings violated his right to confront witnesses under the federal and state constitutions.

[39] As noted, we review a trial court's evidentiary rulings for an abuse of discretion. *Fairbanks*, 119 N.E.3d at 567. We start with Hendricks' challenge to the relevance of the recorded calls. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Ind. Evid. Rule 401. In general, relevant evidence is admissible, and irrelevant evidence is inadmissible. Ind. Evid. Rule 402. "A court's discretion is wide on issues of relevance and unfair prejudice." *Snow v. State*, 77 N.E.3d 173, 176 (Ind. 2017).

[40] The State argues the recordings of Balfour and Hendricks' conversations were relevant as evidence of Hendricks' guilt in the attempted robbery and death of C.O. Specifically, the State claims the recordings show that Hendricks and Balfour were attempting to conceal their wrongdoing by reaching out to witnesses about their potential trial testimony. We agree. When the calls took place in May and June 2019, it was clear Hendricks' case was going to trial. In

one recording, Hendricks and Balfour discussed different people using code names, including "J.B.," "D.C.," and "Lacy." Tr. Ex. Vol., State's Ex. 86, 92. In a different call, Hendricks told Balfour that he had spoken to an unidentified person and convinced him to do something that he would not discuss on the call, saying "It still ain't got to be explained." *Id.* at State's Ex. 90. In another call, Hendricks and Balfour also discussed the importance of keeping people "on the team." *Id.* at State's Ex. 92.

[41] Hendricks and Balfour's discussions are relevant because, during trial, the State confronted several witnesses who had given statements to the police but later presented a different version of events. For example, Artie Thomas gave a statement to the police on July 8, 2015, identifying Hendricks and Balfour as the gunmen, and he repeated his identification during a July 14, 2017 deposition. But at trial, Thomas claimed he had not seen the gunmen's faces, and the prosecutor had to remind him of his prior statements.

[42] Similarly, on July 9, 2015, Jamel Barnes gave a statement to the police in which he said that he heard Balfour ask Hendricks, "Why did he run?" and further asked if Hendricks took anything from the house. Tr. Vol. 4, p. 86. Barnes also claimed in the statement that he encountered Hendricks, Balfour, and Covington on July 4, 2015, and Balfour threatened to kill anyone who spoke to the police. But at trial, months after Hendricks and Balfour had their recorded conversations about persons including a "J.B.," Barnes claimed he could not remember the events of July 2, and the prosecutor read his statement into

evidence. The recordings of the video calls are relevant to prove Hendricks' guilt because they establish he and Balfour were attempting to conceal their crimes.

[43] Hendricks next argues that even if the recorded video calls are relevant, they are confusing and unduly prejudicial. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Ind. Evid. R. 403. "All evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial value of that evidence." *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012), *trans. denied*. The balancing of the probative value against the danger of unfair prejudice must be determined with reference to the issue to be proved by the evidence. *Ward v. State*, 138 N.E.3d 268, 273 (Ind. Ct. App. 2019).

[44] At trial, and on appeal, the State claims the recorded calls had probative value because they showed Hendricks and Balfour were attempting to convince witnesses to change their stories about the attempted robbery and murder of C.O., which the State further claims is proof of Hendricks' guilt. Hendricks responds that the recordings were hard to understand and inflammatory because Hendricks and Balfour used a great deal of foul language. The recordings contain much profanity, but Hendricks and Balfour do clearly

discuss other people using code words, and the importance of talking to those persons and getting them "on the team." They do not discuss other crimes or misconduct. Under these circumstances, any prejudice to Hendricks from the recordings did not outweigh the probative value relevant to the question of whether Hendricks was attempting to conceal his wrongdoing.

[45] Next, Hendricks claims the recorded calls between him and Balfour are inadmissible because they contain hearsay. We disagree. The definition of hearsay is set forth above, but we further note that an out-of-court statement admitted for the truth of the matter asserted is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity." Ind. Evid. Rule 801(d). Thus, Hendricks' statements in the recordings are not hearsay. *See Harrison v. State*, 32 N.E.3d 240, 255 (Ind. Ct. App. 2015) (admission of recording of jail phone call to which Harrison was a party was not erroneous; Harrison's own statements were not hearsay), *trans. denied*.

[46] As for Balfour's statements, the trial court instructed the jury as follows before the recorded calls were played:

> The officers testified that one [of the people on the recording] is the Defendant, and the other is William Balfour. The statements that are by Mr. Balfour are actually hearsay. They're not being offered for the truth of the matter asserted. They're being offered to show context because obviously you can't really have one side of a telephone conversation and make any sense out of it. So it's

> just being offered to you to help you make sense out of the conversations. But what Mr. Balfour says is not to be used by [sic] any evidence in support of the State's case in chief. It's just being used for context.

Tr. Vol. 5, p. 23. Balfour's statements do not fall under Rule 801's definition of hearsay because they were not admitted for the truth of the statements, but rather to allow the jury to make sense of Hendricks' side of the conversations. *See Eastwood v. State*, 984 N.E.2d 637, 642 (Ind. Ct. App. 2012) (no prejudice in admittance of a witness's testimony about a person's statement; the trial court instructed the jury not to consider the testimony for the truth of the matter asserted but rather as an explanation for what the witness did next), *trans. denied*. We presume that a jury follows the trial judge's instructions.[7] *Thrash v. State*, 88 N.E.3d 198, 205 (Ind. Ct. App. 2017).

[47]    Next, we turn to Hendricks' constitutional claims. Constitutional claims raise questions of law, which we review de novo. *Tiplick v. State*, 43 N.E.3d 1259, 1262 (Ind. 2015). On appeal, Hendricks challenges the admission of the recordings under the federal and state constitutions, but during trial he objected only on grounds of the "confrontation clause." Tr. Vol. 5, pp. 21-22. We presume he was raising a claim under the Confrontation Clause of the United

---

[7] Hendricks claims that the trial court's instruction was "insufficient," Appellant's Br. p. 13, but does not provide any evidence nor cite any authority in support of his claim.

States Constitution, and he has procedurally defaulted a similar claim under the Indiana Constitution by failing to separately argue it at trial. *See Redfield v. State*, 78 N.E.3d 1104, 1108 (Ind. Ct. App. 2017) (Indiana constitutional claim waived; Redfield failed to present an argument to the trial court under the Indiana Constitution that was separate from his federal constitutional claim), *trans. denied*.

[48]   The Confrontation Clause, as set forth in the Sixth Amendment, provides: "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Supreme Court of the United States has determined, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004).

[49]   In *Williams v. State*, 930 N.E.2d 602, 605 (Ind. Ct. App. 2010), *trans. denied*, the State presented recordings of drug transactions in which Williams had participated. Williams objected to the recordings, arguing he could not cross-examine the confidential informant who also spoke on the recordings. The trial court admitted the recordings into evidence, instructing the jury that they should consider the informant's statements only as context for the entire conversation, not for the truth of matters discussed by the informant.

On appeal, Williams claimed the admission of the informant's statements violated the Confrontation Clause. The Court rejected Williams' claim, stating: "the Confrontation Clause does not apply to nonhearsay statements, even if those statements are testimonial." *Id.* at 609. The informant's statements were not admitted for the truth of the matter asserted, but merely to give context to Williams' statements, and were not hearsay.

In Hendricks' case, as in Williams' case, the trial court instructed the jury that Balfour's statements in the recordings were not to be considered for the truth of the matter asserted. As a result, the statements were not hearsay, and admission of the recordings did not violate the Confrontation Clause. In summary, the trial court did not err in admitting the recordings into evidence.

## III. Admission of Witness Identifications of Hendricks

Hendricks argues that the trial court should have excluded S.J. and Thomas' testimony that identified him as one of the intruders. He further claims that S.J. and Thomas' identifications of him were the result of the police's "impermissibly suggestive" pre-trial processes for identifying the intruders and that their in-court identifications were too uncertain to be credited. Appellant's Br. p. 15.

Hendricks did not object at trial to S.J. or Thomas' testimony identifying him as the gunman. As a result, he has procedurally defaulted this claim for appellate review. *See Neukam v. State*, 934 N.E.2d 198, 201 (Ind. Ct. App. 2010)

(Neukam waived appellate challenge to identification evidence by failing to contemporaneously object at trial).

## IV. Sufficiency of the Evidence

[54] Hendricks claims the State failed to present sufficient evidence to sustain his convictions. In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment and neither reweighing the evidence nor judging the credibility of the witnesses, we conclude that no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000).

[55] To obtain a conviction of conspiracy to commit robbery as charged, the State was required to prove beyond a reasonable doubt that (1) Hendricks (2) with the intent to commit robbery (3) agreed with Balfour and/or Covington to commit robbery (4) and Hendricks or one of the persons with whom he agreed (5) took an overt act in furtherance of the agreement, (6) resulting in serious bodily injury to C.O. *See* Ind. Code §§ 35-42-5-1, 35-41-5-2. The State further alleged, and the jury was instructed, that the overt act at issue was one or more of the following: (1) obtaining a firearm; (2) arranging the purchase of marijuana from C.O. or S.J.; (3) calling Darius Covington; or (4) traveling to C.O. and S.J.'s home.

[56] Hendricks claims there is insufficient evidence of his intent to commit robbery. We disagree. Intent is a mental function and, absent an admission by the defendant, the trier of fact "must resort to the reasonable inferences from both the direct and circumstantial evidence to determine whether the defendant" had the requisite intent to commit the offense. *Stokes v. State*, 922 N.E.2d 758, 764 (Ind. Ct. App. 2010), *trans. denied*.

[57] Hendricks' cousin, Balfour, was unhappy with C.O. about a gun sale that had occurred a week prior to the shooting, believing that C.O. had underpaid him. Further, Balfour had expressed an interest in obtaining money through robbery. On the evening of July 2, 2015, as Barnes drove Hendricks, Balfour, Covington, and Thomas to C.O. and S.J.'s house, purportedly to buy marijuana, the group discussed the idea of robbing C.O.

[58] When they arrived at C.O. and S.J.'s house, Hendricks, Balfour, Covington, and Thomas agreed that Covington and Thomas, who had never been to the house before and did not regularly smoke marijuana, would go into the house. As Covington approached the house, he believed an agreement had been struck to rob the house's occupants. While Covington was in the bathroom, someone using Barnes' phone called Thomas' phone, which was in Covington's possession, and a ten-minute conversation took place. Hendricks and Balfour entered the house minutes after the call ended.

Hendricks never objected to the idea of robbing C.O., traveled with the group to the house, agreed that Covington and Thomas would initially go into the house, and entered the house with Balfour after a phone call between Thomas' phone and Barnes' phone. This evidence is sufficient to establish beyond a reasonable doubt that Hendricks intended to participate in robbing C.O. and S.J. *See Wieland v. State*, 736 N.E.2d 1198, 1203 (Ind. 2000) (affirming conviction of conspiracy to commit robbery; Wieland accompanied a friend, who he knew to be armed and had expressed an intent to rob a convenience store, into the convenience store and did not leave the friend at any point prior to the robbery). Hendricks' arguments to the contrary amount to a request to reweigh the evidence, which our standard of review forbids.

As for the offense of felony murder, the State alleged that Hendricks was guilty as either a principal or an accomplice to the offense. The General Assembly has defined accomplice liability as follows: "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ." Ind. Code § 35-41-2-4 (1977). Thus, to obtain a conviction of felony murder as charged, the State was required to prove beyond a reasonable doubt that (1) Hendricks, or someone who Hendricks had aided, (2) killed C.O. (2) while committing or attempting to commit robbery of C.O. and S.J. *See* Ind. Code 35-42-1-1.

Hendricks argues that his felony murder conviction must be reversed because there is insufficient evidence that he committed the underlying felony, a robbery

or attempted robbery. We disagree. Balfour needed money, was angry at C.O. over a gun sale, and had expressed interest in robbing someone. Covington agreed with some or all of the people in Barnes' car to rob C.O. and S.J. under the guise of a marijuana transaction.

[62] Shortly after Covington entered the bathroom and someone used Barnes' telephone to call Thomas' phone (which was in Covington's possession), two intruders brandishing handguns entered C.O. and S.J.'s house and ordered S.J. to get on the floor. Next, one of the intruders fatally shot C.O. in the back as he attempted to escape. Thomas identified the intruders as Hendricks and Balfour, and S.J. thought that one of the gunmen resembled Hendricks.

[63] Afterwards, Barnes heard Balfour ask Hendricks why C.O. ran, and if Hendricks took anything from the house. Several days later, Barnes encountered Hendricks, Balfour, and Covington at a fireworks display, and Balfour threatened to kill anyone who talked to the police. This is ample evidence that Hendricks, as a principal or an accomplice, knowingly or intentionally attempted to rob C.O. and S.J., and C.O. was fatally shot during the commission of the attempted robbery. This evidence is sufficient to sustain his conviction. *See Wieland*, 736 N.E.2d at 1203 (affirming conviction of felony murder as an accomplice; Wieland joined with a friend to rob a convenience store, and the friend fatally shot a person on the way out of the store).

# V. Double Jeopardy

[64] Hendricks claims his convictions violate article 1, section 14 of the Indiana Constitution, which provides, in relevant part: "no person shall be put in jeopardy twice for the same offense." Specifically, he argues his convictions of felony murder and conspiracy to commit robbery amount to double punishment for one criminal act. A double jeopardy claim is a question of law, which we review de novo. *Wadle v. State*, 151 N.E.3d 227, 237 (Ind. 2020).

[65] In *Wadle*, the Indiana Supreme Court overruled prior precedent, *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999), and established a new framework to resolve claims of unfair multiple punishments arising from a single proceeding. The *Wadle* Court stated:

> when multiple convictions for a single act or transaction implicate two or more statutes, we first look to the statutes themselves. If either statute clearly permits multiple punishment, whether expressly or by unmistakable implication, the court's inquiry comes to an end and there is no violation of substantive double jeopardy. But if the statutory language is not clear, then a court must apply our included-offense statutes to determine whether the charged offenses are the same. If neither offense is included in the other (either inherently or as charged), there is no violation of double jeopardy. But if one offense is included in the other (either inherently or as charged), then the court must examine the facts underlying those offenses, as presented in the charging instrument and as adduced at trial. If, based on these facts, the defendant's actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction," then the prosecutor may charge

the offenses as alternative sanctions only. But if the defendant's actions prove otherwise, a court may convict on each charged offense.

*Id.* at 253 (citation omitted).

Under the first step of the *Wadle* analysis, we turn to the statutes that govern Hendricks' convictions and consider whether they permit multiple punishments. At the time Hendricks committed his offenses, Indiana Code section 35-42-1-1, which governs felony murder, provided in relevant part:

> A person who . . . kills another human being while committing or attempting to commit arson, burglary, child molesting, consumer product tampering, criminal deviate conduct (under IC 35-42-4-2 before its repeal), kidnapping, rape, robbery, human trafficking, promotion of human trafficking, sexual trafficking of a minor, or carjacking (before its repeal) . . . commits murder, a felony.

Indiana Code section 35-42-5-1, which governs robbery, provided in relevant part:

> A person who knowingly or intentionally takes property from another person or from the presence of another person . . . by using or threatening the use of force on any person . . . or by putting any person in fear . . . commits robbery, a Level 5 felony. However, the offense is a Level 3 felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant, and a Level 2 felony if it results in serious bodily injury to any person other than a defendant.

The State charged Hendricks with conspiracy to commit robbery. At the time Hendricks committed his offenses, the statute that governs conspiracy provided:

> (a) A person conspires to commit a felony when, with intent to commit the felony, the person agrees with another person to commit the felony. A conspiracy to commit a felony is a felony of the same level as the underlying felony.
>
> * * * * *
>
> (b) The state must allege and prove that either the person or the person with whom he or she agreed performed an overt act in furtherance of the agreement.

Ind. Code § 35-41-5-2. None of these statutes clearly permit multiple punishments.

We now turn to the next step: applying the included offense statutes to determine whether one offense is included in the other, either inherently or as charged. Indiana Code section 35-38-1-6 (1983) provides: "Whenever . . . a defendant is charged with an offense and an included offense in separate counts; and . . . the defendant is found guilty of both counts; judgment and sentence may not be entered against the defendant for the included offense." The General Assembly has defined an included offense as:

> an offense that:

(1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;

(2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or

(3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

Ind. Code § 35-31.5-2-168 (2012).

[70] Based on the charging information, Indiana Code section 35-31.5-2-168 is implicated in this case. The information alleges Hendricks committed felony murder by robbing or attempting to rob C.O. and S.J., resulting in C.O.'s death. The charging information further alleges Hendricks committed conspiracy to commit robbery resulting in serious bodily injury by agreeing with others to commit robbery, and he or one of his co-conspirators took an overt act in furtherance of the agreement, resulting in serious bodily injury to C.O. The offense of conspiracy to commit robbery could be an included offense of the felony murder, as charged in this case, because they differ only in the respect that a less serious harm to C.O. is required to establish conspiracy to commit robbery.

Having determined that one of the offenses may be an included offense of the other as charged, we turn to the final step of the *Wadle* analysis: examining the facts underlying the offenses to determine whether Hendricks' actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." 151 N.E.3d at 253.

In Hendricks' case, his acts were compressed in time, place, and continuity of action. Hendricks, Balfour, Barnes, Thomas, and Covington arrived at C.O. and S.J.'s house at approximately 10:30 p.m. After a brief discussion, it was agreed that Thomas and Covington would enter the house for the purported drug buy, even though neither of them regularly smoked marijuana, and neither of them had been to the house before. After looking at C.O.'s guns, Covington went to the restroom and, using Thomas' phone, had a ten-minute phone call with someone using Barnes' phone. Immediately after the call ended, Hendricks and Balfour entered the house, brandishing handguns, and ordered S.J. to get on the floor. One of the two intruders fatally shot C.O. as he attempted to flee. At 10:53 p.m., S.J. texted his friend Wells to say he had been robbed. The crucial events occurred in a span of minutes.

Further, in closing arguments to the jury, the prosecutor summarized the evidence leading up to C.O.'s shooting supporting as a seamless series of events:

> So let us look one last time at that mountain of evidence that has been presented. The sale of the AR-15 leading to Balfour having

seller's remorse. Balfour looking for licks. Both the Defendant and Balfour knowing where C.O. lives and what he has in his house while Darius, Jamel, and Artie have never been there before. Balfour casing the location. All five of them at The Grove. The Defendant and Balfour wanting to be – are the ones wanting to go get weed, with Balfour directing the way to [C.O.'s] house. Darius and Artie however being the ones to go get the weed. The 11-minute phone call linking what is happening inside the house to those people outside. Artie's identification of the Defendant and Balfour coming in with the guns. S.J.'s identification lining up with Artie's. Again, putting the Defendant coming through the door first shouting get down on the ground. Then the one gunshot in [C.O.'s] back.

Tr. Vol. 5, pp. 93-94.

[74]   To be sure, with respect to the charge of conspiracy to commit robbery resulting in serious bodily injury, the State had identified several overt acts that could have occurred well in advance of Hendricks' arrival at C.O. and S.J.'s house, specifically: (1) obtaining a firearm; (2) arranging the purchase of marijuana from C.O. or S.J.; or (3) traveling to C.O. and S.J.'s home. But at trial, the State did not present any evidence demonstrating when Hendricks obtained his firearm or if Hendricks or any of his companions contacted C.O. or S.J. prior to the group's arrival at the house at 10:30 p.m. Further, the evidence presented at trial indicated that the group in Barnes' car did not decide to rob C.O. until they were already en route to the house. Instead, the facts as presented at trial focused on Hendricks and his companions' acts upon arriving at the house, and a key element of the conspiracy offense – serious bodily injury to C.O. –

occurred at the same time as the murder in the felony murder charge. Under these facts, we conclude Hendricks' criminal acts were a single transaction not subject to multiple punishments. *See Thurman v. State*, 158 N.E.3d 372, 380 (Ind. Ct. App. Oct. 7, 2020) (convictions of pointing a firearm, criminal recklessness, and attempted murder arose from the same transaction involving the same victim based on evidence presented at trial and argued by prosecutor, and the included offenses could not stand).

[75] Under these circumstances, the appropriate remedy is to vacate Hendricks' conviction of the included offense, conspiracy to commit robbery. *See Wadle*, 151 N.E.3d at 255-56 (ordering vacatur of the lesser offense, operating while intoxicated). Vacatur will not alter Hendricks' overall sentence, because the trial court ordered Hendricks to serve his sentences concurrently.

# Conclusion

[76] For the reasons stated above, we affirm in part, reverse in part, and remand with instructions for the trial court to vacate Hendricks' conviction of conspiracy to commit robbery.

[77] Affirmed in part, reversed in part, and remanded with instructions.

Bailey, J., and Crone, J., concur.